John V. CALCE II; William B. Heyn; Impact Equity, LLC; and Blue Lion Ventures, Ltd., Appellants/Cross–Appellees,

v.

DORADO EXPLORATION, INC., Appellee/Cross–Appellant.

No. 05–08–00588–CV.

Court of Appeals of Texas, Dallas.

March 29, 2010.

---

Jeffrey S. Levinger, Brett Kutnick, Hankinson Levinger LLP, Dallas, TX, for Appellants/Cross–Appellees.

W. Alan Wright, Nina Cortell, Ben L. Mesches, Haynes & Boone, L.L.P., Dallas, TX, for Appellee/Cross–Appellant.

Before Justices BRIDGES, LANG, and LANG–MIERS.

## OPINION

Opinion By Justice LANG.

In this case, we address breach of contract claims and a claim for misappropriation of trade secrets relating to two agreements: a confidentiality agreement (the "Confidentiality Agreement") and an agreement providing for compensation for services (the "Fee Agreement"). Following a jury trial, a judgment was signed by the trial court awarding (1) money damages, injunctive relief, and attorney's fees to Dorado Exploration, Inc. ("Dorado") (appellee/cross-appellant) on its claims for breach of the Confidentiality Agreement and misappropriation of trade secrets against John V. Calce II ("Calce"), William B. Heyn ("Heyn"), Impact Equity, LLC ("Impact Equity"), and Blue Lion Ventures, Ltd. ("Blue Lion") (appellants/cross-appellees) (collectively, "Appellants"); and (2) money damages, stock, and attorney's fees to Impact Equity on the breach of contract counterclaim of Impact Equity and Blue Lion against Dorado respecting the Fee Agreement.

In five issues on appeal, Appellants (a) assert error in the trial court below in rendering judgment against Appellants on Dorado's claims and the awarding of attorney's fees to Dorado and (b) challenge the adequacy of the jury's award to Impact Equity as to the breach of contract

counterclaim. In addition, Impact Equity contends this Court lacks jurisdiction to consider Dorado's cross-appeal. Dorado asserts two cross-points,[1] challenging Impact Equity's recovery on its breach of contract counterclaim and asserting that, should the breach of contract counterclaim fail, Impact Equity and Blue Lion are not entitled to recovery on their alternative counterclaim for quantum meruit. Based on the analysis below, we affirm the trial court's judgment in part, reverse the judgment in part, and render judgment that Dorado take nothing on its claims for breach of contract, attorney's fees, and misappropriation of trade secrets.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dorado is an oil and gas exploration company formed by Donal Schmidt and Thimothy Wafford. At the time of the events giving rise to this case, Schmidt was Dorado's chief executive officer and president and Wafford was Dorado's chief operating officer. In April 2005, Schmidt, Wafford, and Calce attended a meeting at the offices of Piot Capital Advisors, LLC ("Piot Capital") to discuss the selling of Dorado stock.

At that time, the Confidentiality Agreement was executed. The Confidentiality Agreement stated in relevant part:

This Agreement is between **Dorado Exploration, Inc.** (a Maryland Corporation) and affiliates and associates (collectively "Offeror") and **Piot Capital Advisors, LLC** (collectively "Receiver") and sets forth the terms for the presentation to Receiver of an oil and gas prospect(s) (the "Prospect(s)") which

will provide Receiver with the opportunity to (1) evaluate the Prospect and to acquire either a direct interest in an oil and gas interest (including, but not limited to, drilling or leasing, royalty, and purchase of producing properties) in the Prospect lands on the basis of mutually acceptable compensation to the Offeror or an indirect interest through purchase of a Security, such as stock or a partnership interest, in or with the Offeror; or (2) facilitate the sale, lease purchase or transfer of the property either for the benefit of Receiver or a third party.

(emphasis original). The Confidentiality Agreement defined "proprietary and confidential information" and provided that for a period of three years, "Receiver" would, in relevant part, (1) keep Dorado's proprietary and confidential information secret and not disclose such information without specific written authorization of Dorado, (2) use Dorado's proprietary and confidential information solely for the purpose of evaluating the "Prospect" and not use such information for financial gain without compensation to Dorado, and (3) not reproduce or make copies of any of Dorado's proprietary and confidential information without specific authorization of Dorado. Further, the "Receiver" agreed not to contact any financial partner, advisor, shareholder, director, stockholder, company member, or banker of Dorado without express written permission.

Paragraph five of the Confidentiality Agreement provided in relevant part:

**Binding Effect on Receiver and Others.** This Agreement entered into by Receiver shall be binding on Receiver

---

1. Dorado asserts five "issues" in its "Appellee/Cross–Appellant's Brief." According to Dorado, "Issues 1, 2, and 4 relate to [Appellants'] appeal. Issues 3 and 5 relate to Dorado's appeal." We construe Dorado's issues number three and five to be cross-points and

address them as such. *See Atlantic Richfield Oil & Gas Co. v. McGuffin*, 773 S.W.2d 711, 715 (Tex.App.-Corpus Christi 1989, writ dism'd by agr.) (construing appellee's issue as cross-point); *see also* Tex.R.App. P. 38.9 (briefing rules to be construed liberally).

and Receiver's owners, officers, directors, employees, agents, associates, attorneys, accountants and representatives. Receiver agrees to inform all such persons and entities of this Agreement and to be liable to the Offeror for the acts of such persons and entities if this Agreement is breached by any one of them.

AGREED TO AND ACCEPTED this 6th day of April, 2005:

OFFEROR:
Dorado Exploration, Inc.
. . . .
Name: Donal R. Schmidt, Jr.
Signature: /s/ via email
Title: President and CEO

RECEIVER:
Company: Piot Capital Advisors, LLC

Name: John V. Calce
Signature: [*handwritten signature*]
Title: Partner [handwritten]

(emphasis original).

On April 18, 2005, the second agreement at issue in this case, the Fee Agreement, was executed. The Fee Agreement stated in relevant part:

> This letter agreement ("Agreement") confirms the terms and conditions of the engagement of Impact Equity and Blue Lion Ventures (collectively "Impact Equity") by Dorado Exploration, Inc. and its affiliates (collectively, the "Company" or "DE") to render certain financial advisory and investment banking services to DE in connection with the Company's review of its strategic and financial alternatives, specifically, the Company's Funding. In the context of this agreement, "Funding" means the aggregate value of any equity, debt, promissory notes or other funds raised in conjunction with the venture capital funding round of DE.

In paragraph one of the Fee Agreement, Dorado agreed to pay Impact Equity for its services as follows:

> (a) An engagement fee of $1,000 payable upon execution of [the Fee Agreement]; plus
>
> (b) Upon completion of the Company's Initial Funding with an identified funding source, a final success fee equal to the percentage of all funds raised as defined on the following schedule and a percentage of the common stock or partnership units of DE as defined by the following schedule:
>
> (i) 10% success fee and percentage on all equity funds and 7% success fee and percentage on all debt funds raised up to and including $5 million
>
> (ii) 9% success fee and percentage on all equity funds and 6% success fee and percentage on all debt funds raised greater than $5,000,001 up to and including $7.5 million
>
> (iii) 8% success fee and percentage on all equity funds and 5.5% success fee and percentage on all debt funds raised greater than $7,500,001 up to and including $10 million
>
> (iv) 7% success fee and percentage on all equity funds and 5% success fee and percentage on all debt funds raised greater than $10,000,001
>
> Any fees paid pursuant to subparagraph 1(a) shall be credited against this funding fee.

Additionally, the Fee Agreement provided in relevant part:

(emphasis original). Finally, the Confidentiality Agreement stated "Offeror shall be entitled to recover the cost and expenses incurred in enforcing this Agreement including any attorney's fees."

The signature portion of the Confidentiality Agreement appeared in relevant part as follows:

2. *Term.* The term of this Agreement shall commence on the date hereof and end six (6) months thereafter. . . . The Company agrees to pay Impact Equity any fees specified in paragraph 1 to the extent that any event specified therein occurs with an Identified Funding Source during the term of this Agreement or within thirty-six (36) months after the termination or expiration of this Agreement. Any obligation pursuant to this Paragraph 2 shall survive the termination or expiration of this Agreement.

3. *Exclusivity.* The Company agrees to retain Impact Equity on an exclusive basis in connection with a possible Funding by a defined Identified Funding Source provided on Exhibit B attached hereto.

(emphasis original). The Fee Agreement was signed by Calce as president of Impact Equity and by Schmidt as chief executive officer of Dorado.

In late April 2006, Petrobridge Investment Management, LLC ("Petrobridge"), which "arrange[s] financings" in the oil and gas business, expressed interest in "arranging" for debt financing to Dorado in the form of a credit facility. Petrobridge proceeded to "arrange" a transaction whereby a credit agreement (the "Credit Agreement") was prepared and a loan was made to Dorado. The Credit Agreement named D.B. Zwirn Special Opportunities Fund, L.P. ("Zwirn") and Drawbridge Special Opportunities Fund L.P. ("Drawbridge") as lenders. The transaction between Dorado and the lend-ers in the Credit Agreement closed on August 9, 2006. Under the Credit Agreement, Dorado received initial debt funding totaling approximately $4 million. Further, the Credit Agreement provided that up to approximately $21 million in additional debt funding would be disbursed by the lenders, Zwirn and Drawbridge, when certain conditions precedent were "satisfied to the [l]enders' satisfaction."

On August 3, 2006, prior to the closing of the transaction involving the Credit Agreement, Dorado filed this lawsuit against Calce, Heyn, Impact Equity, Blue Lion, and others[2] (collectively, "defendants"). In its original petition, Dorado asserted claims for breach of the Confidentiality Agreement, attorney's fees, and injunctive relief. Dorado alleged, in relevant part, that Calce and Heyn had become dissatisfied with the amount of compensation offered to them in connection with the transaction involving the Credit Agreement and Calce had contacted Petrobridge in an effort to thwart that transaction. According to Dorado's original petition, (1) all defendants were bound by the Confidentiality Agreement; (2) Calce breached the Confidentiality Agreement by contacting Petrobridge without Dorado's written consent; and (3) the other defendants breached the Confidentiality Agreement through their agent, Calce. On the same date the original petition was filed, Dorado obtained a temporary restraining order enjoining Appellants from contacting Dorado's partners or bankers or disclosing Dorado's confidential or proprietary information without express written consent.[3]

---

**2.** Also named as defendants in this lawsuit were Piot Capital and The Draken Financial Group, LLC ("Draken"). All claims against Piot Capital were nonsuited or otherwise dismissed prior to trial. Although Draken was still a party at the time of trial, no claims were submitted by or against Draken at the close of the evidence.

**3.** The trial court later signed an agreed order dissolving the temporary restraining order and establishing a temporary injunction that

Defendants responded to Dorado's petition with a general denial and an answer that was subsequently amended to include, in relevant part, a "verified defense" in which they denied that Calce, individually, Heyn, individually, or the other defendants "executed or agreed to be bound by the Confidentiality Agreement." Additionally, Impact Equity and Blue Lion filed counterclaims and amended counterclaims against Dorado requesting, in relevant part (1) a declaratory judgment regarding the enforceability of the Fee Agreement and the payment due to Impact Equity under that agreement, (2) damages for breach of contract, (3) attorney's fees, and (4) recovery in quantum meruit. Specifically, Impact Equity and Blue Lion alleged in their last pleading on file at the time of trial that (1) the Fee Agreement "is legal and enforceable pursuant to its terms"; (2) the services of defendants to Dorado had culminated in a "$25 million credit facility," entitling defendants to "at least $1,387,500.00 in a cash success fee on the $25 million credit facility, and at least 23.5% in common equity of Dorado," plus expenses under the Fee Agreement; and (3) defendants had satisfied all conditions precedent to bringing their action for breach of the Fee Agreement.

In response to the counterclaims of Impact Equity and Blue Lion, Dorado generally denied the claims and asserted in relevant part "by way of affirmative defense" (1) that the Fee Agreement "is ambiguous and should be construed against its drafter," (2) anticipatory repudiation, (3) that "[d]efendants never identified the funding sources that might have triggered a commission until *after* [the Fee Agreement] expired by its terms, thereby negating a contractual obligation to pay any commis-

sion" (emphasis original), and (4) that "[d]efendants are not entitled to recover in equity because [d]efendants have unclean hands." Additionally, Dorado included in its last answer on file at the time of trial a "specific denial," asserting "[d]efendants have failed to satisfy a condition precedent to their recovery for breach of contract, including but not limited to the failure of [d]efendants to identify funding sources that might have triggered a commission *before* [the Fee Agreement] expired by its terms." (emphasis original).

On October 10, 2007, in a document titled "Response to Impact Equity's Second Motion for Partial Traditional and No–Evidence Summary Judgment," Dorado asserted in part that "[u]nbeknownst to Dorado," Impact Equity breached the Confidentiality Agreement in August 2005 by "secretly sending Dorado's [proprietary and confidential information] to Avondale Resources Corporation ("Avondale"), a competitor of Dorado in the oil and gas business." According to Dorado, Calce had informed Avondale that he could assist Avondale with financing. In an August 5, 2005 email to Avondale's president and chief executive officer, Calce wrote he had a "strategy" for Avondale that "makes sense and can be executed quickly." Calce attached to the email as "sample write ups" more than two hundred pages of Dorado's proprietary and confidential information, including a feasibility study conducted for Dorado by a consultant regarding Dorado's business plan (the "Feasibility Study").

Additionally, Dorado's October 10, 2007 summary judgment response included a section with the heading "Dorado was damaged by [Impact Equity's] breaches of the Confidentiality Agreement." In that

kept in place Appellants' nondisclosure obligations, precluded the disclosure of certain confidential information, and required Appel-

lants to return certain confidential information to Dorado.

section, Dorado argued in relevant part that it was "entitled to prove its damages by measuring what was gained by [Impact Equity] through its disclosure of Dorado's [proprietary and confidential information] to Avondale." Dorado asserted the value of Dorado's proprietary and confidential information to Impact Equity "can be measured by a 'reasonable royalty.'"

Dorado filed supplemental petitions on October 19, 2007, and November 5, 2007, adding, in relevant part, facts pertaining to the August 2005 disclosure of its proprietary and confidential information to Avondale and a claim for "misappropriation of confidential information and trade secrets." With regard to that claim, Dorado requested an injunction enjoining defendants from disclosing, using, or disseminating Dorado's trade secrets and confidential and proprietary information.

This case proceeded to trial on November 12, 2007. After four days of testimony, the trial court submitted twenty-two questions to the jury. The jury found, in relevant part: (1) Calce, Heyn, Impact Equity, and Blue Lion agreed to enter into the Confidentiality Agreement with Dorado and failed to comply with that agreement; (2) Calce, Heyn, Impact Equity, and Blue Lion misappropriated Dorado's trade secrets; (3) $400,000 would fairly and reasonably compensate Dorado for its reasonable royalty damages that resulted from the misappropriation of its trade secrets; (4) Calce, Heyn, Impact Equity, and Blue Lion each caused twenty-five percent of the reasonable royalty damages to Dorado; (5) Dorado failed to comply with the Fee Agreement, and such failure to comply was not excused; and (6) $750,000 as a cash success fee, $26,000 in expenses, and 5% of Dorado's common stock would fairly and reasonably compensate Impact Equity and/or Blue Lion for their damages result-

ing from Dorado's failure to comply with the Fee Agreement.

On December 13, 2007, defendants filed several post-trial motions in which they argued in relevant part (1) under the unambiguous terms of the Fee Agreement, Impact Equity was entitled to a $1,387,500 cash success fee and 23.5 percent of Dorado's common stock, or, alternatively, a success fee of $897,500 and at least 5% of Dorado's common stock; (2) as a matter of law, defendants did not agree to enter into the Confidentiality Agreement and they cannot be liable for any breach of that agreement; (3) because Dorado did not plead or disclose its reasonable royalty measure of damages, defendants had "no reason to anticipate this claim for relief and no opportunity to prepare or rebut it at trial"; and (4) there was no evidence to support the jury's award of $400,000 in reasonable royalty damages to Dorado.

On January 11, 2008, Dorado moved for leave to file a trial amendment regarding, in relevant part, a claim for reasonable royalty damages. In its proposed trial amendment, Dorado asserted in part that "[t]he defendants' misappropriation of Dorado's trade secrets has caused and will continue to cause Dorado actual damages, which can be measured in several ways, including by determining what the parties would have agreed to as a fair price for licensing Dorado's confidential information." On that same date, Dorado filed several post-trial motions and responses to defendants' post-trial motions in which Dorado argued in relevant part (1) the jury properly found that all defendants agreed to be bound by and breached the Confidentiality Agreement; (2) the evidence supported the jury's finding that $400,000 would have been a fair price for licensing Dorado's confidential information; (3) the defendants were on notice that Dorado intended to seek damages based on a rea-

sonable royalty theory that included consideration of the nature and extent of the use intended for Dorado's trade secret information; (4) because the Confidentiality Agreement and the Fee Agreement were dependent contracts as a matter of law, defendants' prior material breach of the Confidentiality Agreement excused Dorado's performance under the Fee Agreement; and (5) by submitting a jury question requested by defendants regarding calculation of damages under the Fee Agreement, the trial court implicitly found the Fee Agreement to be ambiguous, and the jury's interpretation of the ambiguous contract language was reasonable.

Defendants filed a verified objection to Dorado's motion for leave to file a trial amendment on January 14, 2008, asserting surprise and prejudice. On February 4, 2008, after a hearing, the trial court granted Dorado leave to file the portion of its proposed trial amendment regarding its claim for reasonable royalty damages. On that same date, the trial court rendered judgment against Dorado on the breach of contract counterclaim of Impact Equity and Blue Lion, awarding Impact Equity (1) $776,000 in actual damages, consisting of a $750,000 success fee and $26,000 in expenses under the Fee Agreement; (2) 5% of Dorado's common stock; (3) attorney's fees; and (4) pre-judgment and post-judgment interest.[4] In addition, the trial court rendered judgment against defendants on Dorado's claims for breach of

contract and misappropriation of trade secrets, awarding Dorado (1) $400,000 in reasonable royalty damages; (2) attorney's fees; (3) injunctive relief limiting disclosure of Dorado's proprietary and confidential information until April 6, 2008[5]; and (4) pre-judgment and post-judgment interest.[6] Defendants' March 5, 2008 motion for new trial was denied and a timely notice of appeal was filed by defendants.

## II. JURISDICTION TO CONSIDER CROSS-APPEAL

As a threshold matter, we begin with an "additional issue" raised by Impact Equity in its cross-appellee's brief. Impact Equity contends this Court "lacks jurisdiction to consider Dorado's cross-appeal because Dorado made the deliberate and intentional decision to not timely appeal the judgment." In essence, Impact Equity asserts this Court erred by granting Dorado's presubmission motion for an extension of time to file a notice of appeal because Dorado (1) repeatedly made the intentional and deliberate decision to not file a timely appeal of the trial court's judgment, (2) unequivocally informed the trial court that it was not appealing the judgment just days before the deadline for doing so, and (3) only changed its mind and claimed "inadvertence" months later. Dorado argues this Court did not err by granting its motion for an extension of time because the undisputed evidence provides a plausi-

**4.** Although Blue Lion was also a party to the Fee Agreement, the judgment awarded all compensation and expenses due under that agreement to Impact Equity in accordance with that agreement's terms.

**5.** Appellants assert in a footnote in their brief in this Court that because the injunctive relief awarded by the trial court has expired on its own terms, "the trial court's award of injunctive relief is now moot." Dorado does not address such relief on appeal. We agree with Appellants that the trial court's award of in-

junctive relief is moot. *See Young v. Young*, 168 S.W.3d 276, 287 (Tex.App.-Dallas 2005, no pet.) (issue becomes moot when resolution cannot have practical legal effect on then-existing controversy).

**6.** Consistent with the jury's verdict, the trial court's judgment made Calce, Heyn, Impact Equity, and Blue Lion each responsible for 25% of the monetary relief awarded to Dorado.

ble and reasonable explanation to justify the extension. Further, Dorado argues there is no harm, no prejudice, and no delay in permitting appellate review of its cross-appeal.

## A. Applicable Law

■ The timely filing of a notice of appeal is jurisdictional. *See* TEX.R.APP. P. 25.1(b). This Court may extend the time to file a notice of appeal if, within fifteen days after the filing deadline, the party provides a motion complying with Texas Rule of Appellate Procedure 10.5(b). *See* TEX.R.APP. P. 26.3. Rule 10.5(b) requires a party seeking additional time for filing a notice of appeal to state the facts relied on to "reasonably explain" the need for an extension. TEX.R.APP. P. 10.5(b)(2)(A). A reasonable explanation is "any plausible statement of circumstances indicating that failure to file within the [required] period was not deliberate or intentional, but was the result of inadvertence, mistake, or mischance." *Hone v. Hanafin,* 104 S.W.3d 884, 886 (Tex.2003) (citing *Meshwert v. Meshwert,* 549 S.W.2d 383, 384 (Tex.1977)). Under the liberal standard of review applied in cases involving untimely appeals, "[a]ny conduct short of deliberate or intentional noncompliance qualifies as inadvertence, mistake, or mischance—even if that conduct can also be characterized as professional negligence." *Garcia v. Kastner Farms, Inc.,* 774 S.W.2d 668, 670 (Tex. 1989); *see also Hone,* 104 S.W.3d at 887. Thus, the proper focus in such cases "is on a lack of deliberate or intentional failure to comply." *Garcia,* 774 S.W.2d at 670.

■ This Court's ruling on the motion at issue before submission of this appeal on the merits is an interlocutory order. *See McLendon v. McLendon,* 862 S.W.2d 662, 668 (Tex.App.-Dallas 1993, writ denied), *disapproved on other grounds by Dallas Mkt. Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 386 (Tex.1997). "As such, the complaining party can incorporate the ruling on the motion in a motion for rehearing filed in this Court or assign it as error in the appellate brief." *Id.* (citing *Smith v. Free,* 130 Tex. 23, 107 S.W.2d 588, 590 (1937)).

## B. Application of Law to Facts

■ The record shows that on April 28, 2008, counsel for Dorado filed an "Amended Unopposed Motion to Withdraw as Counsel." That motion stated, in relevant part:

> The current settings and pending deadlines in this matter are as follows:
>
> April 30, 2008 Hearing on Defendants' Motion to Set Type and Amount of Security
>
> May 5, 2008 Deadline to Appeal Final Judgment
>
> The pending deadlines do not cause this withdrawal to create undue hardship on any of the parties to this matter.

On the final page of the motion, beneath the word "AGREED:," was the signature of Penny Schmidt, general counsel for Dorado ("P. Schmidt").

At the April 30, 2008 hearing before the trial court, P. Schmidt appeared on behalf of Dorado. At the beginning of that hearing, P. Schmidt objected to the trial court addressing Appellants' motion for a turnover order on the ground that she had no notice such an order would be addressed at the hearing. In asserting her position, P. Schmidt stated, "[T]his is a judgment that they're appealing. Not us. We're happy with. [sic] We're not particularly happy with it, but we're good with it. We don't want to appeal it. We think it was a proper finding." Further, at a subsequent point in that proceeding, P. Schmidt stated, "... we are not appealing, but moving beyond that."

In its September 19, 2008 motion for an extension of time to file its notice of appeal, Dorado stated that at the time of the trial court's February 4, 2008 judgment and through the May 16, 2008 deadline for filing its notice of appeal, Dorado was in "severe financial distress," which ultimately led to a bankruptcy filing on May 19, 2008. Dorado alleged the April 30, 2008 withdrawal of its counsel left it "without counsel to focus on the appeal deadlines and management of the litigation." According to Dorado, although P. Schmidt was substituted as counsel, her focus was on "meeting the substantial demands of the pending bankruptcy cases." Dorado stated, "Indeed, during this time, [Dorado's] day-to-day energy and resources were focused almost exclusively on saving the company through the bankruptcy process. As a result of this focus, [Dorado] inadvertently missed the May 16, 2008 deadline to file a notice of appeal." In addition, Dorado asserted that its requested extension of time "would promote the just and equitable resolution of this appeal and would not harm Appellants" because (1) all of the parties covered by Dorado's notice of appeal are already before the Court as a result of Appellants' May 2, 2008 notice of appeal; (2) the judgment consists of awards for and against Dorado, and Appellants seek review of both aspects of the judgment; and (3) Dorado is only requesting that the Court conduct a complete review of a judgment the Court would be reviewing in any event. Attached to Dorado's motion was an affidavit of P. Schmidt.

In a September 29, 2008 response to Dorado's motion, Appellants asserted that the statements of P. Schmidt at the April 30, 2008 hearing, her signature on the April 28, 2008 motion of counsel to withdraw, and Dorado's inaction with regard to filing a notice of appeal demonstrated that Dorado's "failure to appeal was in fact the result of a deliberate and intentional decision." Appellants argued that in moving for an extension, Dorado (1) did not assert that it "formed an intent" to appeal the judgment before expiration of the filing deadline and (2) did not explain how its circumstances prevented it from filing a timely notice of appeal before the deadline. Citing *Crossland v. Crossland,* No. 05–06–00228–CV, 2006 WL 925032, at *2 (Tex. App.-Dallas Apr. 11, 2006, no pet.) (mem. op.), Appellants asserted, "Under similar circumstances, appellate courts have 'repeatedly held as unreasonable and noncompliant explanations that reflect [a party's] awareness of the deadline for filing a timely notice of appeal but a decision to ignore it.'" Further, Appellants contended they would be prejudiced by an extension, because an appeal by Dorado would subject Impact Equity's entire award to a challenge that otherwise would not exist and would involve review of issues not raised by Appellants' timely appeal.

In an October 1, 2008 reply in support of its motion, Dorado argued in relevant part that although P. Schmidt indicated at the April 30, 2008 hearing that Dorado did not plan to appeal the trial court's judgment, "this spur-of-the-moment statement made under intense time pressure in the midst of the company's financial crisis, at a hearing of which Ms. Schmidt had no notice, and without the benefit of [Dorado's] outside litigation counsel has to be assessed in the context in which it was made." Appellants filed a "sur-reply" to Dorado's motion on October 3, 2008, emphasizing their previous arguments regarding Dorado's conduct and lack of evidence of Dorado's intent to appeal.

This Court's October 3, 2008 order stated the following as to Dorado's motion:

We GRANT appellee's September 19, 2008 motion to extend time to file its

notice of appeal. The notice of appeal filed by appellee on September 19, 2008 is considered timely for jurisdictional purposes.

(emphasis original).

In its cross-appellee's brief, Impact Equity asserts substantially the same arguments as those made by Appellants in their response to Dorado's September 19, 2008 motion. Likewise, Dorado asserts in its "Cross–Appellant's Reply Brief" substantially the same arguments contained in that motion. As directed by the supreme court, our focus is on "a lack of deliberate or intentional failure to comply." *Garcia,* 774 S.W.2d at 670. The facts before us do not show Dorado made a "decision to ignore" the deadline for filing its notice of appeal. *See Crossland,* 2006 WL 925032, at *2. Further, we have found no cases requiring Dorado to show evidence of an "intent" to appeal. Impact Equity contends "[Dorado's] after-the-fact explanation for its failure to timely file a notice of appeal is neither reasonable nor plausible, but rather is belied by its own words and conduct in the court below demonstrating a deliberate, intentional, and informed decision not to appeal from a judgment it was 'good with.'" However, in light of the undisputed evidence regarding the events described in Dorado's motion, it is unclear how Dorado's statement of circumstances was not "plausible." Moreover, based on the record before us, we cannot conclude Dorado's conduct constituted "deliberate and intentional noncompliance." *See Hone,* 104 S.W.3d at 887; *Garcia,* 774 S.W.2d at 670. Therefore, Dorado's conduct qualifies as "inadvertence, mistake, or mischance." *See Hone,* 104 S.W.3d at 887 (under liberal standard of review in cases involving untimely appeals, any conduct short of deliberate or intentional noncompliance qualifies as inadvertence, mistake, or mischance); *Garcia,* 774 S.W.2d at 670 (any conduct short of deliberate or inten-

tional noncompliance qualifies as inadvertence, mistake, or mischance—even if that conduct can also be characterized as professional negligence). Accordingly, Dorado's motion complies with rule 10.5(b)(2)(A). Tex.R.App. P. 10.5(b)(2)(A); *see also Hone,* 104 S.W.3d at 886. We decline to disturb our prior ruling granting Dorado's motion to extend time to file its notice of appeal. *See McLendon,* 862 S.W.2d at 669; *Heritage Life Ins. Co. v. Heritage Group Holding Corp.,* 751 S.W.2d 229, 231 (Tex.App.-Dallas 1988, writ denied). Further, based on the analysis above, we conclude this Court does not lack jurisdiction to consider Dorado's cross-appeal. *See Heritage Life Ins. Co.,* 751 S.W.2d at 231–32; Tex.R.App. P. 26.3. We decide against Impact Equity on its "additional issue" regarding jurisdiction.

## III. LEGAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT JURY'S FINDINGS ON DORADO'S CLAIMS

Next, we consider the merits of Appellants' issues regarding Dorado's claims for breach of the Confidentiality Agreement and misappropriation of trade secrets. In doing so, we address Appellants' first and third issues, in which they challenge, in part, the legal sufficiency of the evidence to support the jury's findings, and Appellant's second and fourth issues, which are integrally related thereto.

### A. Standard of Review

An appellant challenging the legal sufficiency of the evidence to support a finding on an issue on which it did not have the burden of proof must demonstrate there is no evidence to support the adverse finding. *Sears, Roebuck & Co. v. AIG Annuity Ins. Co.,* 270 S.W.3d 632, 636 (Tex.App.-Dallas 2008, pet. denied) (citing *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983);

*Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex.App.-Dallas 2006, pet. denied)). To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Sears, Roebuck & Co.*, 270 S.W.3d at 636 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519 (Tex. 2002)). We sustain a no evidence point only if there is no more than a scintilla of evidence to support the challenged finding. *Id.* at 636–37. In making this determination, we must "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 637 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005)). We look to see whether any record evidence supports the challenged finding. *Id.* More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 899 (Tex.App.-Dallas 2006, no pet.). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Sears, Roebuck & Co.*, 270 S.W.3d at 637 (citing *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex.2006)). "[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *St. Joseph Hosp.*, 94 S.W.3d at 530; *see also Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001).

### B. Analysis

#### 1. Breach of the Confidentiality Agreement

In their first issue, Appellants assert "the trial court erred in rendering judg-

ment against Impact Equity, Blue Lion, Calce, and Heyn on Dorado's claim for breach of [the Confidentiality Agreement] where (a) Dorado voluntarily non-suited the only other party to that agreement (Piot Capital Advisors, LLC) before trial and (b) neither Impact Equity, Blue Lion, Calce, nor Heyn were parties or signatories to that agreement and cannot be liable for any alleged breach of that agreement as a matter of law." Specifically, Appellants contend, in part, that no evidence supports the jury's findings in questions number one and number two of the charge of the court that Calce, Heyn, Impact Equity, and Blue Lion each "agree[d] to enter into the Confidentiality Agreement with Dorado" and failed to comply with that agreement. In their fourth issue, Appellants assert the trial court erred by awarding attorney's fees to Dorado where Dorado had no contract with, or viable breach of contract claim against, Calce, Heyn, Impact Equity, or Blue Lion.

Dorado responds that Appellants' argument ignores the substantial evidence showing that "[Appellants], by virtue of their own testimony and conduct, agreed to the terms of the Confidentiality Agreement." Further, Dorado asserts that because the trial court's judgment properly enforced the Confidentiality Agreement through an injunction, Dorado was entitled to recover attorney's fees pursuant to section 38.001(8) of the Texas Civil Practice and Remedies Code and, independently, pursuant to the express language of the Confidentiality Agreement, which provided Dorado "shall be entitled to recover the cost and expenses incurred in enforcing this Agreement, including any attorney's fees." We address Appellants' first and fourth issues together.

#### a. Applicable Law

A party claiming breach of contract has the burden to prove the elements

of that cause of action, which include (1) the existence of a valid contract between the plaintiff and defendant, (2) the plaintiff performed, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *See James M. Clifton, Inc. v. Premillenium, Ltd.*, 229 S.W.3d 857, 859 (Tex.App.-Dallas 2007, no pet.). Under chapter 38 of the Texas Civil Practice and Remedies Code, a person who prevails on a claim for "an oral or written contract" may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs. TEX. CIV. PRAC. & REM. CODE § 38.001(8) (Vernon 2008); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex.2009). Further, "parties are free to contract for a fee-recovery standard either looser or stricter than [c]hapter 38's" with regard to attorney's fees. *Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex.2009).

### b. Application of Law to Facts

■ Claiming they are not parties to the Confidentiality Agreement and there is no evidence to support the jury's answers to questions number one and number two of the charge of the court, Appellants challenge the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof. *See James M. Clifton, Inc.*, 229 S.W.3d at 859 (party claiming breach of contract has burden to prove existence of valid contract between plaintiff and defendant and breach of that contract). Therefore, we must examine the entire record and determine whether more than a scintilla of evidence supports the challenged findings. *See Sears, Roebuck & Co.*, 270 S.W.3d at 636–37.

The charge of the court instructed the jury that " 'Confidentiality Agreement' shall refer to the Confidentiality Agree-ment that was executed on April 6, 2005." Question number one of the charge of the court read as follows:

> Did the following Defendants agree to enter into the Confidentiality Agreement with Dorado?
>
>> In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.
>>
>> Answer "Yes" or "No" for each of the following:
>>
>> **John V. Calce II:** _____
>>
>> **William B. Heyn:** _____
>>
>> **Impact Equity:** _____
>>
>> **Blue Lion:** _____

(emphasis original). The jury answered "Yes" as to each defendant.

Question number two of the charge of the court read as follows:

> If you answered "Yes" for any Defendants listed in Question No. 1, answer the following question as to any such Defendants. Otherwise, do not answer this question.
>
> **Question No. 2**
>
> Did such Defendant(s) fail to comply with the Confidentiality Agreement?
>
>> Answer "Yes" or "No" as to each of the following:
>>
>> **John V. Calce II:** _____
>>
>> **William B. Heyn:** _____
>>
>> **Impact Equity:** _____
>>
>> **Blue Lion:** _____

(emphasis original). The jury answered "Yes" as to each defendant.

Question number seven of the charge instructed the jury that if they answered "Yes" to question number two or found Dorado was entitled to reasonable royalty damages in an amount greater than zero

on its claim for misappropriation of trade secrets, they were to decide a reasonable fee for the necessary services of Dorado's attorneys for pursuing Dorado's claims for breach of contract and/or misappropriation of trade secrets. The jury answered "$100,000" in question number seven with regard to "preparation and trial" and "0" with regard to appeals.[7]

Dorado argues there is substantial evidence to support the jury's answers to question number one of the charge of the court, especially in light of the fact that question "was not simply, 'Who signed the agreement?'" but, rather "asked whether an agreement was evidenced by the parties' statements and actions." Dorado asserts the jury's affirmative answers as to all defendants are supported by (1) testimony of Calce that he intended to protect Dorado's confidential information, that he did not believe that "the confidentiality is in dispute," and that he intended that Impact Equity and Blue Lion "keep Dorado's business information confidential without being expressly authorized to disclose it"; and (2) testimony of Heyn that he, in Dorado's words, "'intended to act as if [he] had been' 'bound' by the Confidentiality Agreement." Additionally, Dorado asserts the Feasibility Study contained a "nondisclosure agreement" that was "virtually identical in scope" to the Confidentiality Agreement, with the only difference between the two agreements being three additional oil and gas prospects specifically referred to in the Confidentiality Agreement, but not included in the nondisclosure agreement. According to Dorado, because Calce's testimony showed he treated the nondisclosure agreement in the Feasibility

Study as "self-executing," the jury could find that Appellants, as individuals and entities given access to the Feasibility Study, "agreed to the Confidentiality Agreement's terms." Further, Dorado asserts "[p]arties are bound by the individual agreements that make up a unified and interconnected transaction—even if they were not parties to one of those individual agreements." Therefore, Dorado argues, based on the words and conduct of Calce and Heyn and the "close links" in time, participants, and subject matter between the "related" Confidentiality Agreement and the Fee Agreement, the jury could properly find that Calce and Heyn, individually and as representatives of Impact Equity and Blue Lion, "agreed to enter into the Confidentiality Agreement." Finally, Dorado contends that "Calce's knowledge and acceptance of the obligations under the Confidentiality Agreement, the express language binding him individually, and his expressed intent to keep Dorado's information confidential demonstrate that he agreed to add his own responsibility as 'Receiver' under the Confidentiality Agreement to that of Piot Capital." Therefore, Dorado argues, the "binding effect" language of paragraph five of the Confidentiality Agreement "reaches not only Piot Capital (and Calce under a substituted authority analysis), but also Calce's agents, associates and representatives, including Heyn, Impact Equity, and Blue Lion."

■ We carefully consider these contentions, but we must discern how the law requires us to evaluate the sufficiency of the evidence. The record shows no objection by Dorado regarding question number one in the charge of the court.[8] "[I]t is the

7. Upon a post-trial motion of Dorado, the trial court disregarded the jury's answer to question number seven with regard to appeals and rendered judgment awarding Dorado an

additional $150,000 in conditional appellate attorney's fees.

8. The record shows Dorado's "Requested Question 1" of its proposed jury questions

court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge." *St. Joseph Hosp.,* 94 S.W.3d at 530; *see also Bradford,* 48 S.W.3d at 754. Therefore, we review the sufficiency of the evidence in light of the charge submitted. *See St. Joseph Hosp.,* 94 S.W.3d at 530; *Bradford,* 48 S.W.3d at 754.

The record shows Calce signed the Confidentiality Agreement as "Partner" on behalf of Piot Capital, which was designated in the agreement as "Receiver." Even assuming, without deciding, that the testimony of Calce and Heyn that they intended to keep Dorado's business information confidential and the testimony of Calce that he did not believe "the confidentiality is in dispute" falls within the boundaries of what the jury was instructed to consider, such testimony does not show Calce or Heyn "agree[d] to enter into" the specific Confidentiality Agreement executed on April 6, 2005, individually or on behalf of any entities other than Piot Capital. Likewise, whether Appellants' statements or actions evidenced their assent to a "nondisclosure agreement" in the Feasibility Study is not relevant to whether Appellants "agree[d] to enter into" the April 6, 2005 Confidentiality Agreement referred to in the charge. Further, to the extent Dorado argues the Confidentiality Agreement is "binding on" Appellants pursuant to paragraph five contained therein, paragraph five does not address whether Appellants "agree[d] to enter into" the Confidentiality Agreement.

Now, we address Dorado's proposition that Calce and Heyn, individually and as

representatives of Impact Equity and Blue Lion, "agree[d] to enter into" the Confidentiality Agreement because the Confidentiality Agreement and the Fee Agreement "make up a unified and interconnected transaction." However, the cases cited by Dorado in support of that proposition are distinguishable from the case before us because they involve instruments that either pertain to the "same transaction" or expressly refer to one another. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000) ("instruments pertaining to the same transaction may be read together to ascertain the parties' intent"); *Baylor Univ. Med. Ctr. v. Epoch Group, L.C.,* 340 F.Supp.2d 749, 755 (N.D.Tex.2004) (instruments executed at different times constituted single contract, where such instruments expressly referred to one another); *In re BP Am. Prod. Co.,* 97 S.W.3d 366, 369 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding) (two instruments were "parts of a single agreement" where one recited it was "expressly contemplated" by other, specifically referred to provisions of other, and contained merger clause referencing other). Here, neither the Confidentiality Agreement nor the Fee Agreement referenced the other. Further, while Dorado asserts the two instruments at issue were "related" and had "close links" in time, participants, and subject matter, Dorado does not assert, and the record does not show, those agreements were part of the "same transaction." *See Fort Worth Indep. Sch. Dist.,* 22 S.W.3d at 840. Dorado cites no cases, and we have found none, in which parties to instruments "related" in the manner asserted herein were construed as "bound" in

read, "Did any of the [Appellants] agree to the terms set forth in the Confidentiality Agreement?" The wording of question number one in the charge of the court differs from that proposed question. The record is silent as to

how question number one came to be worded as it was in the charge of the court, and the parties do not address that matter in their appellate briefs.

the manner argued by Dorado. Accordingly, because Dorado's proposition has no basis in law, we cannot agree with Dorado that, based on Calce and Heyn's words and conduct and the subject and timing of the two agreements at issue, "the jury could easily find that Calce and Heyn, both individually and as representatives of Impact Equity and Blue Lion, agreed to enter into the Confidentiality Agreement."

We conclude there is no evidence to support the jury's finding in question number one of the charge of the court that Calce, Heyn, Impact Equity, and Blue Lion "agree[d] to enter into the Confidentiality Agreement." *See St. Joseph Hosp.*, 94 S.W.3d at 530 (sufficiency of evidence is reviewed in light of charge submitted); *Bradford*, 48 S.W.3d at 754 (same). In light of that conclusion, no basis remains for Appellants' liability to Dorado for breach of the Confidentiality Agreement. *See James M. Clifton, Inc.*, 229 S.W.3d at 859 (party claiming breach of contract has burden to prove existence of valid contract between plaintiff and defendant). Further, because Dorado's claimed entitlement to attorney's fees is based only on its breach of contract claim and its enforcement of the Confidentiality Agreement pursuant to that claim, we conclude Dorado is not entitled to attorney's fees.[9] *See MBM Fin. Corp.*, 292 S.W.3d at 666 (party must prevail in order to recover attorney's fees in breach of contract action). Appellants' first and fourth issues are decided in their favor.

### 2. Misappropriation of Trade Secrets

In their second issue, Appellants contend the trial court erred in rendering judgment against Heyn on Dorado's claim for misappropriation of trade secrets because there was no evidence Heyn acquired or engaged in the unauthorized use of Dorado's purported trade secrets. Appellants argue that "[i]n the absence of any such evidence against Heyn, there is no basis for rendering judgment against him for reasonable royalty damages (or any other relief) on Dorado's claim for misappropriation of trade secrets." In their third issue, Appellants assert the trial court erred in rendering judgment against them for $400,000 in reasonable royalty damages on Dorado's claim for misappropriation of trade secrets "where (a) Dorado did not timely plead or disclose that it was seeking any damages on this claim; (b) the trial court erroneously submitted a damages question to the jury, over Defendants' timely objection, that could not be supported after the fact by a post-verdict pleading amendment alleging a new claim for reasonable royalty damages; and (c) no evidence supported an award of reasonable royalty damages in any amount, including $400,000." We consider Appellants' second and third issues together, beginning with the portion of Appellants' third issue regarding whether the award of $400,000 in reasonable royalty damages was supported by the evidence.

#### a. Applicable Law

Misappropriation of trade secrets is a common-law tort cause of action. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex.App.-Austin 2004, pet. denied). Under Texas law, a plaintiff can recover for misappropriation of trade secrets by establishing (1) existence of a trade secret, (2) breach of a

9. Dorado does not argue on appeal that it is entitled to attorney's fees with respect to its claim for misappropriation of trade secrets. Moreover, to the extent the jury found in question number seven of the charge of the court that Dorado was entitled to any attorney's fees with respect to such claim, our conclusion later in this opinion regarding reasonable royalty damages obviates any potential basis for such attorney's fees.

confidential relationship or improper discovery of a trade secret, (3) use of the trade secret without the plaintiff's authorization, and (4) resulting damages. *See Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex.App.-Dallas 2009, pet. denied); *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14–07–00717–CV, 2008 WL 1991747, at *4 (Tex.App.-Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.). The appropriate measure of damages in such cases is a "reasonable royalty." *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir.1974). "This does not mean a simple percentage of actual profits; instead, the trier of fact ... must determine 'the actual value of what has been appropriated.'" *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir.1986) (quoting *Vitro Corp. v. Hall Chem. Co.*, 292 F.2d 678, 683 (6th Cir.1961) and citing *Univ. Computing Co.*, 504 F.2d at 537).

While every case involving misappropriation of trade secrets requires a "flexible and imaginative approach" to the problem of damages, certain standards have emerged from the cases. *Univ. Computing Co.*, 504 F.2d at 538–39. As stated by the Fifth Circuit,

> If the defendant enjoyed actual profits, a type of restitutionary remedy can be afforded the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success. Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use

the defendant intended at the time the misappropriation took place.

*Id.*

In calculating what a fair licensing price would have been had the parties agreed, the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; prices past purchasers or licensees may have paid; the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; the nature and extent of the use the defendant intended for the secret; and whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternative processes. *Metallurgical Indus. Inc.*, 790 F.2d at 1208 (citing *Univ. Computing Co.*, 504 F.2d at 540). "Estimation of damages, however, should not be based on sheer speculation." *Id.* If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable. *Id.* In that instance, a permanent injunction is a proper remedy for the breach of a confidential relationship. *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1180 (5th Cir.1983) (citing *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 778 (1958)); *see also Metallurgical Indus. Inc.*, 790 F.2d at 1208.

### b. Application of Law to Facts

Question number five of the charge of the court read as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dorado for its damages, if any, that resulted from [the misappropriation of its trade secrets]?

> Consider the following elements of damages, if any, and none other. Answer separately in dollars and cents (un-

less otherwise instructed), if any, for each of the following:

1. Reasonable royalty.

In determining a reasonable royalty, you should calculate what the parties would have agreed to as a fair price for licensing Dorado's confidential information. Your determination does not depend on the parties' actual willingness to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered negotiations for royalties at the time of the Dorado's [sic] confidential information was used. In calculating what a fair licensing price would have been had the parties agreed, you should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the confidential information to Dorado, including Dorado's development costs and the importance of the confidential information to Dorado's business; the nature and extent of the use intended for the confidential information; and the availability of alternative sources for the information.

**Answer:** _____

(emphasis original). The jury's answer to question number five was "$400,000." Because this challenged finding concerns an issue on which Appellants did not have the burden of proof, we must determine whether more than a scintilla of evidence supports the finding. *See Sears, Roebuck & Co.*, 270 S.W.3d at 636–37.

The record shows that during cross-examination, Calce testified in part as follows:

Q. Now, would you agree, Mr. Calce, that by sharing Dorado's confidential information with Avondale Resources, you were able to obtain a benefit for yourself and Mr. Heyn?

A. I would disagree with that.

Q. Isn't it true that by virtue of sharing this information with Avondale Resources you were able to convince Avondale Resources to enter into a contract with one of your companies, Blue Lion Ventures?

A. That is not the reason that came to be.

Q. There was a contract, however, in November of 2005 between Blue Lion Ventures and Avondale Resources Corporation, correct?

A. That is correct. In November of 2005.

Q. And under that contract, you were going to be providing services, similar to the ones, those that you performed for Dorado or supposedly performed for Dorado under your agreement?

A. They were somewhat different, actually.

. . . .

Q. And the contract that you entered into with Avondale Resources, you being you and Mr. Heyn and your company Blue Lion Ventures, would you agree with me that it's a lucrative contract?

A. I have not been paid my money under that contract at this time.

Q. Well, you're claiming you're owed in excess of $800,000 under that contract, aren't you, Mr. Calce?

A. Yes.

Further, during closing argument, counsel for Dorado argued in relevant part:

So what do you think Mr. Calce and Mr. Heyn should have paid Dorado for this information that put them in a position today to have $800,000 owed to them? That's for you to decide. You can determine that because this particu-

lar feasibility study and business plan was the crown jewel of Dorado, that Dorado should be reimbursed 100 percent for that, or $800,000. Or you might think 50 percent is fair compensation to Dorado, or perhaps even a quarter.

Dorado asserts that because defendants did not object to the form of question number five, the sufficiency of the evidence to support the jury's finding must be evaluated under the framework of the question submitted. Further, citing the cross-examination testimony of Calce quoted above, Dorado argues in its brief on appeal:

> Dorado presented evidence without objection through Calce that Defendants used Dorado's trade-secret information to obtain a contract with Avondale valued at over $800,000. The jury can easily infer that the misappropriation allowed Defendants to reap an economic benefit given timing of the disclosure (August 2005) and the written Avondale Contract (November 2005). Dorado also presented evidence that it provided its trade-secret information to Defendants so they could obtain funding for Dorado under the terms of the Fee Agreement sued upon by [Impact Equity]. Impact Equity contends in this appeal that it is entitled to recover a fee of $1,387,500 plus 23.5% of Dorado's common stock.
>
> The evidence thus shows that [Impact Equity] intended to use Dorado's trade-secret information to gain profits that it claims are worth more than $2 million.

(citations omitted). Dorado asserts that the reasonable royalty damages measure exists to compensate deserving plaintiffs when, as in this case, the actual value of what has been appropriated is not subject to exact measurement, either by calculation of lost sales to the plaintiff or of actual profits gained by the defendant.

We agree with Dorado that the sufficiency of the evidence to support the jury's finding in question number five of the charge of the court must be reviewed in light of the charge submitted. *See St. Joseph Hosp.*, 94 S.W.3d at 530; *Bradford*, 48 S.W.3d at 754. However, we cannot agree with Dorado that legally sufficient evidence supports the jury's reasonable royalty finding in question number five. Although Calce testified that in November 2005, a contract existed between Blue Lion and Avondale under which Blue Lion was to be paid in excess of $800,000, there is no evidence in the record that the sharing of Dorado's confidential information induced Avondale to enter into that contract. In fact, Calce denied that proposition in the testimony cited by Dorado. Further, the record contains no evidence (1) suggesting the parties would have agreed to $400,000 as a fair price for licensing Dorado's confidential information or (2) supporting a method or calculation by which the jury could arrive at the $400,000 amount. Estimation of reasonable royalty damages "should not be based on sheer speculation." *Metallurgical Indus. Inc.*, 790 F.2d at 1208; *see also Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1578 (Fed.Cir.1988) (declining to affirm royalty damages where court could not "fathom ... the rationale" or basis for calculation), *overruled in part on other grounds by Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed.Cir.2004).

Based on the foregoing analysis, we conclude the evidence in the record is insufficient to support the jury's finding of $400,000 in reasonable royalty damages on Dorado's claim for misappropriation of trade secrets. *See Sears, Roebuck & Co.*, 270 S.W.3d at 636–37 (no evidence point must be sustained if there is no more than scintilla of evidence to support challenged finding). We decide in favor of Appellants

on the portion of their third issue regarding whether the award of $400,000 in reasonable royalty damages was supported by the evidence. Accordingly, we need not address the remaining portions of Appellants' third issue or Appellants' second issue.

## IV. THE FEE AGREEMENT

Both Dorado and Appellants challenge the trial court's judgment regarding the Fee Agreement. In their fifth issue, Appellants contend that, as a matter of law, the judgment awarding Impact Equity a cash success fee of $750,000 and 5% of Dorado's common stock was inadequate under the unambiguous terms of the parties' Fee Agreement where (1) the fee and stock percentage were to be calculated based on stacking tiers in the Fee Agreement whereby Impact Equity would receive greater compensation the more debt funds it raised for Dorado and (2) Impact Equity raised $25 million in debt funds for Dorado through a credit facility. Dorado, in issue number three of its "Appellee/Cross–Appellant's Brief," asserts this Court should render a take-nothing judgment on Impact Equity's claim under the Fee Agreement because (1) expiration of the Fee Agreement barred Impact Equity's contract claim as a matter of law, (2) Dorado was excused, as a matter of law, from performing under the Fee Agreement because of Impact Equity's prior material breach of the Confidentiality Agreement,[10] (3) Impact Equity's failure to obtain a condition-precedent finding requires rendition of a take-nothing judgment on the Fee Agreement claim, and (4) the failure of the Fee Agreement claim bars defendants' recovery of attorney's fees. As to Appellants' contention that

the Fee Agreement is unambiguous regarding calculation of cash and stock fees, Dorado argues (1) Appellants' construction of the compensation provisions of the Fee Agreement "fails" under the standards to be applied in construing unambiguous agreements and (2) this case was "tried as an ambiguity case" and sufficient evidence supports the jury's findings as to the compensation provisions at issue.

### A. Standard of Review and Applicable Law

#### 1. Overcoming Adverse Jury Finding as Matter of Law

A party attempting to overcome an adverse jury finding as a matter of law must surmount two hurdles. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). First, we must examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* "The point of error should be sustained only if the contrary proposition is conclusively established." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

#### 2. Ambiguity of Contract

 The determination of whether a contract is ambiguous is a question of law for the court to decide. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex.2003); *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex.2008). When a contract is not ambiguous, construction of the written instrument is a

---

**10.** In light of our conclusion above that there is no evidence to support the jury's finding that Calce, Heyn, Impact Equity, and Blue Lion "agree[d] to enter into the Confidentiality Agreement," we need not reach this portion of Dorado's issue number three.

question of law for the court and is reviewed de novo. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 650 (Tex.1999) *see also Walden v. Affiliated Computer Servs., Inc.,* 97 S.W.3d 303, 326 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (whether language in unambiguous agreement constituted condition precedent involved contract construction and was therefore question of law). An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008).

▮ If a contract is determined to be ambiguous, interpretation becomes a fact issue. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996); *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). Extrinsic evidence is admissible to determine the meaning of an ambiguous contract. *See, e.g., Royal Maccabees Life Ins. Co. v. James,* 146 S.W.3d 340, 346 (Tex.App.-Dallas 2004, pet. denied).

### 3. Conditions Precedent

▮ A condition precedent is an act or event that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992); *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). While no particular words are necessary for the existence of a condition, such terms as "if," "provided that," "on condition that," or some other phrase that conditions performance, usually connote an intent for a condition, rather than a promise. *Hohenberg Bros. Co.,* 537 S.W.2d at 3; *see also PAJ, Inc. v. Hanover Ins. Co.,* 243 S.W.3d 630, 638 (Tex.2008). In the ab-

sence of such a limiting clause, whether a certain contractual provision is a condition, rather than a promise, must be gathered from the contract as a whole. *See Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990); *Hohenberg Bros. Co.,* 537 S.W.2d at 3. However, where the intent of the parties is doubtful or where a condition would impose an absurd or impossible result, the agreement will not be interpreted as creating a condition. *Hohenberg Bros. Co.,* 537 S.W.2d at 3; *see also Criswell,* 792 S.W.2d at 948 (absence of phrase that conditions performance is probative of parties' intention that a promise was made, rather than a condition imposed). "Because of their harshness in operation, conditions are not favorites of the law." *Hohenberg Bros. Co.,* 537 S.W.2d at 3 (quoting *Sirtex Oil Indus., Inc. v. Erigan,* 403 S.W.2d 784 (Tex.1966)). The rule is "since forfeitures are not favored, courts are inclined to construe the provisions in a contract as covenants, rather than as conditions. If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed." *Id.* (quoting *Henshaw v. Tex. Natural Res. Found.,* 147 Tex. 436, 216 S.W.2d 566 (1949)); *see also Landscape Design & Constr., Inc. v. Harold Thomas Excavating, Inc.,* 604 S.W.2d 374, 377 (Tex.Civ. App.-Dallas 1980, writ ref'd n.r.e.) ("language will not be construed as a condition precedent when another reading of the contract is possible").

▮ A party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied. *See, e.g., Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 283 (Tex.1998). In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent

have been performed or have occurred. Tex.R. Civ. P. 54. "When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party." *Id.*

### B. Analysis

#### 1. Dorado's Cross–Appeal

##### a. Expiration of Fee Agreement

■ We begin with Dorado's assertion in issue number three of its "Appellee/Cross–Appellant's Brief" that expiration of the Fee Agreement barred Impact Equity's contract claim as a matter of law and the trial court's judgment should be reversed insofar as it awards recovery to Impact Equity on its Fee Agreement claim. In question number eight of the charge of the court, the jury was asked, "Did Dorado fail to comply with the Commission/Fee Agreement?" The jury responded "Yes" to question number eight. In question number nine of the charge, the jury found Dorado's failure to comply with the Commission/Fee Agreement was not excused by Impact Equity's (1) previous failure to comply with a material obligation of the same agreement or (2) prior repudiation of the same agreement. Finally, in question number ten of the charge, the jury determined what amounts would fairly and reasonably compensate Impact Equity for Dorado's failure to comply with the Fee Agreement.

Dorado's argument that the Fee Agreement, by its terms, precludes Impact Equity from recovering any contractual fee raises two points. First, according to Dorado, "the [Fee Agreement], as Impact Equity itself understood, only entitled Impact Equity to compensation for funding disbursed from an 'Identified Funding Source'—i.e., a source explicitly identified in Exhibit B to the Fee Agreement." Second, Dorado asserts that because it is undisputed that none of Dorado's lenders were "Identified Funding Sources" at the time the six-month term of the agreement expired, Impact Equity has no right to recover "fees" under the Fee Agreement as a matter of law. Consequently, Dorado contends, the jury's answers to questions number eight, number nine, and number ten of the charge of the court are "immaterial."

Appellants assert Dorado's argument was rejected by the jury in its responses to questions number eight and number nine of the charge of the court. Appellants contend "Dorado has done nothing to overcome these adverse findings on appeal, and the evidence amply supports the jury's verdict."

The record shows (1) Dorado pleaded generally that the Fee Agreement is ambiguous, (2) the trial court made no explicit ruling as to ambiguity of the Fee Agreement, and (3) substantial extrinsic evidence regarding the purported meaning of the Fee Agreement as to identification of funding sources was admitted into evidence at trial without objection. Thus, the record is unclear as to whether the Fee Agreement was determined by the trial court to be ambiguous regarding identification of funding sources.[11] *Cf. David J. Sacks, P.C.*, 266 S.W.3d at 450 (unambiguous contract will be enforced as written and parol evidence will not be received for purpose of creating ambiguity or to give contract meaning different from that which

---

**11.** On appeal, the parties do not address ambiguity of the Fee Agreement with respect to the meaning of "identified funding source." However, both sides cite to extrinsic evidence in the record in support of their appellate arguments regarding the meaning of that term.

its language imports); *Royal Maccabees Life Ins. Co.*, 146 S.W.3d at 346 (extrinsic evidence is admissible to determine meaning of ambiguous contract). However, even assuming, without deciding, that the Fee Agreement is ambiguous in that regard, the record does not support Dorado's matter-of-law challenge before us.

In paragraph one of the Fee Agreement, Dorado and its affiliates, as "the Company," agreed to pay Impact Equity for its services as follows:

(a) An engagement fee of $1,000 payable upon execution of [the Fee Agreement]; plus

(b) Upon completion of the Company's Initial Funding with an identified funding source, a final success fee equal to the percentage of all funds raised as defined [elsewhere in the agreement].

Additionally, the Fee Agreement provided in relevant part:

2. *Term.* The term of this Agreement shall commence on the date hereof and end six (6) months thereafter. . . . The Company agrees to pay Impact Equity any fees specified in paragraph 1 to the extent that any event specified therein occurs with an Identified Funding Source during the term of this Agreement or within thirty-six (36) months after the termination or expiration of this Agreement. Any obligation pursuant to this Paragraph 2 shall survive the termination or expiration of this Agreement.

3. *Exclusivity.* The Company agrees to retain Impact Equity on an exclusive basis in connection with a possible Funding by a defined Identified Funding Source provided on Exhibit B attached hereto.

Paragraph 1 states a success fee was to be paid to Impact Equity upon completion of Dorado's "Initial Funding with an identified funding source." Paragraph 2 states Impact Equity was to be paid any fees specified in paragraph 1 to the extent funding occurred with an "Identified Funding Source" during the six-month term of the agreement or within thirty-six months thereafter. Under the clear language of paragraph 3 of the agreement, Impact Equity was to be retained on an "exclusive basis" as to any "defined Identified Funding Source" listed on "Exhibit B."[12] However, the Fee Agreement does not define "Identified Funding Source," nor does it specify that a funding source must be designated in Exhibit B or identified in writing at any time in order to be an "Identified Funding Source."

In support of its contentions, Dorado cites a January 2006 email from Calce to Schmidt that Dorado contends "acknowledged the expiration [of the Fee Agreement] and confirmed [Impact Equity] was not entitled to any fee except for sources properly identified in writing under the Fee Agreement." However, at trial, Calce testified Impact Equity's entitlement to a success fee under paragraph 1 of the Fee Agreement was not dependent upon listing a funding source in writing on Exhibit B.

The record shows that the six-month term of the Fee Agreement expired on October 18, 2005. Calce testified at trial that in August 2005, he initiated a meeting with Todd Dittman, the managing director of Zwirn, and discussed Dorado. According to Calce, Wafford, Dorado's chief operating officer, assisted him in providing information for Zwirn's review. Calce tes-

---

12. Calce testified on cross-examination that he does not agree there was no "Exhibit B" attached to the Fee Agreement at the time that agreement was executed. However, the record does not show an "Exhibit B" was attached to the Fee Agreement at that time.

tified that through Dittman, he learned Petrobridge was the "screener" of oil and gas deals for Zwirn, and Calce arranged a meeting between Dorado and Petrobridge in September 2005.

In a September 2005 email, Wafford referred in writing to "ongoing negotiations" of Dorado with "PetroBridge" and "D.B. Zwirn." On cross-examination at trial, Wafford testified as follows:

Q. ... [Y]ou would agree that [Impact Equity] specifically introduced Dorado to D.B. Zwirn, who is a potential funding source, correct?

A. Mr. Calce took me to D.B. Zwirn in Houston, Texas, and I met with a fellow named Todd Dittman.

Q. From D.B. Zwirn?

A. Yes. I have no idea whether he was the same D.B. Zwirn Special Opportunities Fund or whether he had anything to do with it.

Q. And you would admit that Impact Equity specifically identified and introduced Dorado to D.B. Zwirn who is a potential funding source in July to August of 2005?

A. That's about the time we went down there.

Q. And you would agree that day is critical because July to August of 2005 is within the initial six month term of the [Fee Agreement], correct?

A. I would agree with that.

. . . .

Q. So within the initial term of the [Fee Agreement], the six month term Dorado was introduced to D.B. Zwirn, correct?

A. We went down to Zwirn's office.

Q. ... Prior to going to Mr. Dittman's office at D.B. Zwirn, you didn't even [know] the man existed, did you?

A. No, sir.

Q. The reason you were in his office was because John Calce, my client, specifically introduced you to him, correct?

A. That's correct.

Q. All right. And just so we're clear, ... no other investment banking group identified Petrobridge or D.B. Zwirn as a potential funding source for Dorado, correct?

A. I believe that's correct.

Further, the record shows (1) Wafford testified on cross-examination at trial that "Zwirn and Drawbridge" were identified by defendants and "eventually became funding sources" and (2) in a videotaped deposition shown at trial, the managing director of Petrobridge testified that in September 2005, "Drawbridge and D.B. Zwirn" had been identified as prospective lenders with regard to Dorado.

In its last petition on file at the time of trial, Dorado stated in part:

In September 2005, Dorado learned through loan arranger [Petrobridge] that two potential lenders, [Zwirn and Drawbridge] were interested in lending money to Dorado. Negotiations regarding funding ensued, and Calce was intimately involved in those loan negotiations. Also involved in the loan negotiations was defendant Heyn....

(citations omitted). Schmidt swore to that same statement in an August 3, 2006 affidavit. Finally, "Schedule 8.05" of the Credit Agreement, titled "Litigation," stated Dorado had an outside legal opinion from its law firm "as to the amount of the fee under Impact Equity's written contract with Dorado" and "Dorado expects to pay the fee." The transaction involving the Credit Agreement closed on August 9, 2006, within thirty-six months of the October 18, 2005 expiration of the six-month term of the Fee Agreement.

Based on the foregoing, we cannot conclude Dorado has shown that, as it alleges on appeal, "Impact Equity is not entitled to any recovery, as a matter of law, under the terms of the Fee Agreement." *See Sterner*, 767 S.W.2d at 690 (party attempting to overcome adverse fact finding as matter of law must show there is no evidence to support jury's answer and contrary proposition is established as a matter of law). Accordingly, we decide against Dorado on the portion of its issue number three of its "Appellee/Cross–Appellant's Brief" pertaining to whether expiration of the Fee Agreement bars Impact Equity's contract claim as a matter of law.

### b. Failure to Obtain a Condition–Precedent Finding

■ Next, we address Dorado's contention in issue number three of its "Appellee/Cross–Appellant's Brief" that Impact Equity's failure to obtain a condition-precedent finding requires rendition of a take-nothing judgment on the Fee Agreement claim. Dorado asserts that "[b]ecause Dorado specifically denied that Impact Equity failed to satisfy its contractual duty to timely and sufficiently identify a funding source that would trigger payment of a fee pursuant to the Fee Agreement, Impact Equity was required to prove that it satisfied these conditions precedent." Dorado contends Impact Equity's failure to satisfy the condition precedent at issue was established as a matter of law. Further, Dorado argues, if such failure was not established as a matter of law, Impact Equity was "required to obtain a jury finding on this essential element." [13]

Impact Equity argues in relevant part that it alleged in its pleading that it satisfied all conditions precedent to bringing its breach of contract claim, and the only specific denial asserted by Dorado was that Impact Equity failed to "identify funding sources that might have triggered a commission before the [Fee Agreement] expired by its terms." According to Impact Equity, "no such condition precedent exists in the Fee Agreement." Further, Impact Equity contends that even if such a condition precedent exists, (1) the evidence conclusively demonstrated Impact Equity identified the appropriate funding sources before the Fee Agreement expired, thus eliminating the need to submit such an issue to the jury, and (2) the jury impliedly determined Impact Equity satisfied such condition precedent when it found in question number eight that Dorado failed to comply with the Fee Agreement and in question number nine that Dorado's failure to comply with the Fee Agreement was not excused by "Impact Equity's previous failure to comply with a material obligation of the same agreement."

As discussed above, Dorado pleaded generally that the Fee Agreement is ambiguous, but the record shows no explicit ruling by the trial court as to ambiguity. [14] However, even assuming, without deciding, that the Fee Agreement is ambiguous as to the existence of the condition precedent alleged, there is no evidence in the record to support Dorado's contention that the Fee Agreement contains such a condition precedent.

Dorado's last answer on file at the time of trial included a "specific denial" asserting "[d]efendants have failed to satisfy a

13. The record shows the trial court denied Dorado's objection to the omission of a question preceding question number eight of the charge of the court regarding "whether defendants met conditions precedent to the contract."

14. On appeal, the parties do not address ambiguity of the Fee Agreement with regard to the condition precedent alleged.

condition precedent to their recovery for breach of contract, including but not limited to the failure of [d]efendants to identify funding sources that might have triggered a commission *before* [the Fee Agreement] expired by its terms." (emphasis original). The Fee Agreement stated in relevant part that Dorado agreed (1) to pay a final success fee to Impact Equity "[u]pon completion of [Dorado's] Initial Funding with an identified funding source" and (2) to pay Impact Equity such a fee "to the extent that [such funding] occurs with an Identified Funding Source during the term of this Agreement or within thirty-six (36) months after the termination or expiration of this Agreement." According to Dorado, "[b]ecause the Fee Agreement defines the set of acts and events 'that must occur before there is a right to immediate performance and before there is a breach of contractual duty,' the Fee Agreement's conditional language meets the standard for a condition precedent." (citing *Hohenberg Bros. Co.*, 537 S.W.2d at 3). However, Dorado cites no language in the Fee Agreement, and we find none, that conditions Dorado's contractual obligation to pay Impact Equity on an obligation of Impact Equity to "identify funding sources that might have triggered a commission" before the agreement expired, or that indicates the parties intended such a condition. Further, the parties cite no extrinsic evidence regarding such intent, and we find none in the record. Based on the record before us, we conclude the Fee Agreement did not contain the condition precedent alleged by Dorado. *See Hohenberg Bros. Co.*, 537 S.W.2d at 3 (where intent of parties is doubtful, agreement will not be interpreted as creating condition); *see also Landscape Design & Constr., Inc.*, 604 S.W.2d at 377 ("language will not be construed as a condition precedent when another reading of the contract is possible"). Therefore, a jury question regarding satisfaction of such condition precedent was not necessary. *Cf. Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 627 (Tex. App.-San Antonio 1996, writ denied) (trial court properly refused to submit jury issues regarding condition precedent where alleged condition precedent was actually covenant). Dorado's pleadings show no other specific denial asserted by Dorado. *See* TEX.R. CIV. P. 54 (when performance or occurrence of conditions precedent have been pleaded, the pleading party shall be required to prove only those specifically denied by opposite party). Accordingly, we decide against Dorado on the portion of its issue number three regarding failure by Impact Equity to obtain a condition-precedent finding.

### c. Impact Equity's Attorney's Fees

In light of our conclusions above, we decide against Dorado on the portion of issue number three of its "Appellee/Cross–Appellant Brief" in which it asserts that the failure of the Fee Agreement claim bars Appellants' recovery of attorney's fees.

### 2. Impact Equity's Compensation Under the Fee Agreement

 Question number ten of the charge of the court read as follows:

If your answer to Question No. 8 is "Yes," then answer the following question. Otherwise, do not answer the following question.

**Question No. 10**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Impact Equity and/or Blue Lion for their damages, if any, that resulted from Dorado's failure to comply [with the Fee Agreement]?

Consider the following elements of damages, if any, and none other. An-

swer separately in dollars and cents (unless otherwise instructed), if any, for each of the following:

 (a) Any cash success fee due under the [Fee Agreement].

 **Answer:** _____

 (b) Any reasonable out of pocket fees, expenses, and costs (including, but not limited to, legal, accounting, travel, accommodations, telephone, computer, courier, and supplies) incurred by Impact Equity and/or Blue Lion in connection with the performance of its activities under the [Fee Agreement].

 **Answer:** _____

 (c) The percentage of Dorado common stock owed to Impact Equity and/or Blue Lion under the [Fee Agreement] (answer in percentage), if any.

 **Answer:** _____

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on past damages, if any.

(emphasis original). The jury answered "$750,000" in response to part (a) of question number ten, $26,000 in response to part (b), and "5%" in response to part (c).

Appellants contend that because Impact Equity raised $25 million in debt funds for Dorado through a credit facility, Impact Equity was entitled as a matter of law under the unambiguous terms of the Fee Agreement to (1) a cash success fee of $1,387,500 or, alternatively, $897,500 and (2) an award of 23.5% of Dorado's common stock. Appellants assert that in arriving at the responses to parts (a) and (c) of question number ten, "the jury necessarily concluded that (1) the payment schedule set forth in the Fee Agreement was comprised of independent tiers that did not allow for stacking (*i.e.*, because more than $10 million was raised, Impact Equity was entitled to only a flat 5% success fee and stock award on *all* funds raised), and (2) the 'debt funds raised' equaled the $15.2 million that Dorado actually drew down on the credit facility raised by Impact Equity (rather than the $25 million that was available to Dorado under that facility)." (emphasis original). However, Appellants argue, the jury "had no discretion to interpret the unambiguous terms of the Fee Agreement and to arrive at damage figures that were contrary to the plain terms of the Agreement and the undisputed facts." Therefore, Appellants assert, the judgment should be modified.

Dorado responds in relevant part that "Impact Equity asked the trial court to submit [question number ten of the charge of the court] to the jury and lodged no objection to the fact that this question necessarily asked the jury to determine the parties' intent with respect to cash and stock fees due under the contract." Further, Dorado asserts, there was "substantial unobjected-to evidence regarding what the fee provision meant." Accordingly, Dorado contends, "this case—contrary to Impact Equity's approach after trial and on appeal—was tried as an ambiguity case."

■■■ In their reply brief, Appellants assert in relevant part that "[t]he mere fact that a damages issue was submitted in Question No. 10 does not support Dorado's claim of ambiguity, because that question did not instruct the jury to interpret any

language of the fee agreement." In support of that assertion, Appellants cite a pattern jury charge instruction on "ambiguous provisions." *See* Comm. on Pattern Jury Charges, State Bar of Texas, *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 101.08 (2008). The pattern jury charge instruction cited by Appellants is intended to be used as an instruction when the trial court determines an agreement contains an ambiguous provision. *Id.,* comment. However, the issue of resolution of an ambiguous contract provision can be submitted to the jury without using such a pattern jury charge instruction. *See Exxon Corp. v. W. Tex. Gathering Co.,* 868 S.W.2d 299, 302 n. 3 (Tex.1993) (instruction delineating ambiguous language and appropriate method of resolving ambiguity is preferred, but not required).

Here, Dorado pleaded the Fee Agreement was ambiguous, and the parties presented substantial evidence and argument as to their conflicting interpretations of the compensation provisions of the Fee Agreement. Question number ten of the charge of the court instructed the jury to consider the elements of damages, "if any," designated in parts (a), (b), and (c) and to answer in dollars and cents, "if any," for each. Under part (a) of question number ten, the jury was instructed to consider "[a]*ny* cash success fee due under the [Fee Agreement]," and under part (c), the jury was to consider "[t]he percentage of Dorado common stock owed to Impact Equity and/or Blue Lion under the [Fee Agreement] (answer in percentage), *if any.*" (emphasis added). Thus, the issue of interpretation of the Fee Agreement as to calculation of compensation was left to the jury. *See Exxon Corp.,* 868 S.W.2d at 302 n. 3; *see also Hicks v. Pilgrim Poultry, G.P.,* 299 S.W.3d 249, 255 (Tex.App.-Texarkana 2009, no pet.) (by sending interpretation of contract to jury, trial court likely held impliedly that contract was ambiguous). By not objecting to question number ten of the charge of the court, Appellants failed to preserve error as to resolution of that issue by the jury. *See* Tex.R.App. P. 33.1(a); *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling"); *cf. Sage St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 446 (Tex.1993) ("By allowing the damages question to go to the jury without any kind of instruction as to its allowance for a $760,000 profit, after conflicting testimony had been presented on this subject, Sage Street consented to resolution of the issue by the jury.").

At trial, Schmidt, chief executive officer and president of Dorado, testified he understood the Fee Agreement to provide that compensation to Impact Equity would be calculated under a single tier of paragraph one, with the applicable tier to be determined by the amount of "the money that was raised or available" to Dorado under the Credit Agreement. Further, Schmidt testified that (1) "[f]unds raised in my mind means money we get or we have access to," and (2) Dorado received "approximately" $15.2 million under the Credit Agreement, "plus or minus a couple hundred dollars." Finally, on direct examination, Schmidt testified as follows:

Q. . . . [Y]ou now know as you sit here today that the $15 million that's been loaned under the [Credit Agreement] is the most money Dorado is ever going to get under this credit facility?

A. Yes, ma'am, I know that.

The Fee Agreement provided in relevant part in section (iv) of paragraph one that Impact Equity was to receive a "7% success fee and percentage on all equity funds and 5% success fee and percentage [of common stock] on all debt funds raised greater than $10,000,001." The jury's answer to part (a) of question number ten, "$750,000," is 5% of $15 million, which comports with section (iv) of paragraph one of the Fee Agreement based on Schmidt's interpretation and "debt funds raised" of $15 million. Likewise, the jury's answer to part (c) of question number ten, "5%," comports with section (iv) of paragraph one on that same basis. Because the record does not show there is "no evidence" to support the contested jury finding, we cannot conclude the judgment awarding Impact Equity a cash success fee of $750,000 and 5% of Dorado's common stock was inadequate as a matter of law. *See Sterner*, 767 S.W.2d at 690 (party attempting to overcome adverse fact finding as matter of law must show there is no evidence to support jury's answer and contrary proposition is established as a matter of law). Accordingly, we decide Appellants' fifth issue against them.

## V. CONCLUSION

Based on the above analysis and the appropriate standards of review, we conclude (1) this Court does not lack jurisdiction to consider Dorado's cross-appeal; (2) because there is no evidence Appellants agreed to enter into the Confidentiality Agreement, Appellants cannot be liable for any breach of that agreement; (3) no basis exists for Dorado's recovery of attorney's fees; (4) there is no evidence to support an award of reasonable royalty damages on Dorado's claim for misappropriation of trade secrets; (5) Impact Equity's contract claim is not barred as a matter of law by expiration of the Fee Agreement; (6) Impact Equity's failure to obtain a condition-precedent finding does not require rendition of a take-nothing judgment on Impact Equity's breach of contract claim; (7) Impact Equity's recovery of attorney's fees is not barred; and (8) Impact Equity is not entitled as a matter of law to a cash success fee greater than $750,000 or an award of more than 5% of Dorado's common stock.

Accordingly, we decide (1) in favor of Appellants on their first issue, the portion of their third issue regarding whether the award of $400,000 in reasonable royalty damages was supported by the evidence, and their fourth issue; (2) against Appellants on their fifth issue; (3) against Impact Equity on its "additional issue" regarding jurisdiction; and (4) against Dorado on the portions of its cross-point asserted in issue number three of its "Appellee/Cross–Appellant's Brief" regarding whether expiration of the Fee Agreement barred Impact Equity's contract claim as a matter of law, whether Impact Equity's failure to obtain a condition-precedent finding requires rendition of a take-nothing judgment on the Fee Agreement claim, and whether the failure of the Fee Agreement claim bars defendants' recovery of attorney's fees. We need not address (1) Appellants' second issue; (2) the remaining portion of Appellants' third issue; (3) the remaining portion of Dorado's cross-point asserted in its issue number three (as noted above in footnote number ten); or (4) Dorado's cross-point regarding whether Impact Equity and Blue Lion are entitled to recovery in quantum meruit, which is asserted in issue number five of Dorado's "Appellee/Cross–Appellant's Brief."

We reverse the portions of the trial court's judgment (1) rendering judgment against Appellants on Dorado's breach of contract claim; (2) awarding attorney's

fees to Dorado; and (3) awarding Dorado $400,000 in reasonable royalty damages. We render judgment that Dorado take nothing on its claims for breach of contract, attorney's fees, and misappropriation of trade secrets. The remainder of the trial court's judgment is affirmed, with the exception of the award of injunctive relief to Dorado, which has become moot.