**Affirmed and Opinion Filed December 14, 2020**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-18-01447-CV**
_____

**SNOWHITE TEXTILE AND FURNISHINGS, INC., Appellant**

**V.**

**INNVISION HOSPITALITY, INC., Appellee**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-11252**

## MEMORANDUM OPINION

Before Justices Osborne, Partida-Kipness, and Pedersen, III
Opinion by Justice Pedersen, III

This suit arises from a dispute between two competitors in the furniture, fixture, and equipment ("FF&E") industry involving violation(s) of the Texas Uniform Trade Secrets Act ("TUTSA"), tortious interference with prospective business, and tortious interference with existing contracts. Following a bench trial, the district court rendered judgment in favor of the plaintiff, Innvision Hospitality, Inc. ("Innvision"). The defendant, Snowhite Textile and Furnishings, Inc. ("Snowhite"), appeals the judgment, asserting, among other issues, that the evidence is insufficient to support the district court's liability findings. We affirm the trial court's judgment.

# I. BACKGROUND

## A. Parties

Wyndham Hotels & Resorts ("Wyndham") is a franchisor for a number of hotel chains including Baymont, La Quinta, Microtel, and Super 8 ("brands"). Innvision and Snowhite are two designated service providers ("DSPs") for Wyndham. These companies compete to provide a suite of services to design and provide FF&E for the Wyndham brands. Wyndham submits leads on their franchisee's projects to their DSPs.[1] After a DSP receives a lead on a Wyndham project, the DSP prepares a preliminary quote—using the information provided by Wyndham—to place a bid with the franchisee on the project.

DSPs often use Wyndham-selected design schemes and manufacturers when working on a Wyndham project. DSPs access a file transfer protocol site maintained by Wyndham ("Wyndham FTP"), which contains information regarding Wyndham's (i) pre-approved schemes and product specifications, and (ii) pre-negotiated pricing with its vendors.

## B. Baymont Odessa Project

Wyndham sent Innvision an advance lead for a franchisee named Brett Norwich to complete FF&E work on a Baymont brand project located in Odessa, Texas ("Odessa Project"). Although Wyndham projects often used generic or

---

[1] These leads are referred to in the industry as "notice[s] of execution." The leads vary in content but generally include a list of (1) required or replacement FF&E and (2) requested project tasks including refinishing, cleaning, and repairing items and areas.

prototype scheme pricing from the Wyndham FTP, Innvision created a custom scheme for the Odessa Project. Innvision did not access information from the Wyndham FTP in creating its preliminary bid for the Odessa Project. In September 2013, Pride Parr submitted Innvision's preliminary bid to the Odessa Project customer. Parr worked in Innvision's "Regional Design and Procurement" group as a sales representative.

Several Innvision employees left to join Snowhite in 2013. Emile Aboona worked at Innvision until July 2013, when he resigned to work at Snowhite. Parr worked at Innvision from July 1, 2013 until the first full week of October 2013, when she resigned to work at Snowhite. Millette Gathright, Kevin Barbarise, and Radhika Khurana also left Innvision to work at Snowhite.

After Parr began work at Snowhite in October 2013, she emailed Emile Aboona—then Snowhite's Chief Operating Officer—documents that Innvision had generated for its preliminary bid on the Odessa Project. This email attached Innvision internal documents that were not shared with the Odessa Project customer. These documents were labeled "Innvision Design," and included specifications, renderings, room schemes, stock codes, descriptions, order quantities, unit costs, unit prices, and net values.

Recognizing the value of these documents, Aboona and Dipak Kapadia, who was Snowhite's founder and president, sought to obtain further Innvision material. Snowhite copied the former Innvision employees' laptops and solicited additional

information related to Innvision's bid on the Odessa Project from then-current and former Innvision employees. Snowhite used the Innvision documents and information that Aboona and the Snowhite information technology worker gathered to secure their own winning bid for the Odessa Project.

**C. Innvision Litigation Against Snowhite**

Innvision sued Snowhite for (i) violations of the TUTSA,[2] (ii) tortious interference with existing contracts, and (iii) interference with prospective business relations and contracts. Innvision also asserted claims against Aboona and Kapadia.

Innvision's claims against Snowhite and Aboona were tried before the trial court on October 23, 24, and 25, 2018.[3] The trial witnesses included Christopher Parker, Innvision's president, co-owner, and co-founder; Kapadia; and Aboona. At the conclusion of the bench trial, the trial court rendered judgment in favor of Innvision, including (i) finding that Innvision owned trade secrets in the form of design and planning specifications, along with pricing and margins data, relating to its bid proposal for the Odessa Project; (ii) finding that Snowhite tortiously interfered with Innvision's prospective contract for the Odessa Project; (iii) finding that Innvision sustained an economic loss of $45,000.00; and (iv) awarding Innvision's attorney's fees against Snowhite. The trial court further ordered that Innvision take

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134A.001–.008.

[3] Prior to final trial, Innvision non-suited its claims against Kapadia.

nothing on its claims against Aboona and dismissed those claims with prejudice.

This appeal followed.

## II. ISSUES RAISED ON APPEAL

Snowhite raises four issues on appeal.

    1.    Whether it was error to find liability under TUTSA where Appellee disclosed the purported "trade secrets" to a mutual third party customer, non-confidentially, before those materials were given to the Appellant?

    2.    Whether it was error to find Tortious Interference with Prospective Business where the alleged interference was Appellant submitting an identical "preliminary bid" to a mutual customer who had openly solicited competing bids, had not yet selected a vendor, and all of this in a bidding environment where much or all of such "preliminary bid" is dictated by the customer?

    3.    Whether it was error to find damages and/or consider evidence of lost profits at trial where a lost profits damages calculation was never disclosed and the actual evidence presented at trial was speculative and conclusory?

    4.    Whether it was error to award attorney's fees under TUTSA where the Appellee failed to properly segregate its fees, and there is no showing of "malice" to support the "willful & malicious misappropriation" element of such award?

Snowhite challenges (i) both the legal and factual sufficiency of the evidence and (ii) the admissibility of certain evidence.[4]

---

[4] We note that Snowhite's briefing does not expressly frame its first two issues as sufficiency issues. Snowhite's briefing fails to meaningfully identify the respective standard of review for these two issues in its appellant brief. *See* TEX. R. APP. P. 38.1(f), (i). Only in Snowhite's reply brief does it identify that the first issue is to be reviewed at least under a factual sufficiency review. To adequately address Snowhite's first two issues, we apply both legal and factual sufficiency review standards.

### III. STANDARD OF REVIEW

"In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict." *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.) (citing *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.–Dallas 2011, no pet.)). Here, the appellate record contains a reporter's record; therefore the trial court's findings of fact are not conclusive and are binding only if supported by the evidence. *Id.* "We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question." *Id.* (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)).

#### i.      Legal Sufficiency

"When an appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding." *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). We view the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not. *Bos v. Smith*, 556 S.W.3d 293, 300 (Tex. 2018). "When reviewing the record, we determine whether any evidence supports the challenged finding." *Fulgham*, 349 S.W.3d at 157. "If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails." *Id.*; *see Formosa Plastics Corp. USA v. Presidio Eng'rs*

–6–

*& Contractors*, Inc., 960 S.W.2d 41, 48 (Tex. 1998); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (more than a scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions"). We defer to the trial court's fact findings if they are supported by legally sufficient evidence. *Bos*, 556 S.W.3d at 300.

ii.     *Factual Sufficiency*

"When an appellant challenges the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding." *Fulgham*, 349 S.W.3d at 157 (citing *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). "We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust." *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Id.* As long as the evidence falls 'within the zone of reasonable disagreement,' we will not substitute our judgment for that of the fact-finder. *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). In conducting a factual sufficiency review, we should detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

### iii. Admissibility of Evidence

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its discretion when it acts "without reference to any guiding rules and principles"—if it acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We will uphold the ruling if there is any legitimate basis in the record to support it. *Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 490 (Tex. App.—Dallas 2016, pet. denied). To reverse an erroneous evidentiary ruling, an appellant must both establish error and show that the error probably caused an improper judgment. TEX. R. APP. P. 44.1; *Thawer v. Comm'n for Lawyer Discipline*, 523 S.W.3d 177, 183 (Tex. App.—Dallas 2017, no pet.).

## IV. ISSUE ONE – WHETHER IT WAS ERROR TO FIND LIABILITY UNDER TUTSA WHERE APPELLEE DISCLOSED THE PURPORTED "TRADE SECRETS" TO A MUTUAL THIRD PARTY CUSTOMER, NON-CONFIDENTIALLY, BEFORE THOSE MATERIALS WERE GIVEN TO THE APPELLANT

"When an effort is made to keep material important to a particular business from competitors, trade secret protection will be available." *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). "TUTSA was enacted in 2013 'to make uniform the law with respect to the subject of this chapter among states enacting it.'" *Baxter & Associates, L.L.C. v. D & D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *6 (Tex. App.—Dallas Feb. 15,

2017, no pet.) (mem. op.) (quoting CIV. PRAC. & REM. § 134A.008). Subsection

134A.002(6) provides,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that:
>
> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

CIV. PRAC. & REM § 134A.002(6). Subsection 134A.002(3) defines

"misappropriation" as,

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who: . . .
>
>> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>>> (a) derived from or through a person who used improper means to acquire the trade secret; . . .

CIV. PRAC. & REM § 134A.002(3). In summary, the elements of trade secret

misappropriation under TUTSA are: (i) a trade secret existed; (ii) the trade secret

was acquired through a breach of a confidential relationship or discovered by

improper means; (iii) the trade secret was used without authorization; and (iv) the

trade secret owner suffered damages as a result. CIV. PRAC. & REM. §§ 134A.002(1),(3),(6); *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 437 (Tex. App.—Dallas 2012, no pet.); *Calce v. Dorado Expl., Inc.*, 309 S.W.3d 719, 737–38 (Tex. App.—Dallas 2010, no pet.) (party is entitled to recover for misappropriation of trade secrets by establishing the existence of a trade secret, breach of a confidential relationship, use of the trade secret without authorization, and resulting damages).

### 1) Innvision's Disclosure of the Odessa Bid Proposal

The trial court found that "[Innvision] owned trade secrets in the form of design and planning specifications, along with pricing and margins data, relating its bid proposal for the [Odessa Project]." The document that is germane to the bid proposal and the trade secret dispute is Exhibit 22—the email from Parr to Aboona. The body of the email reads "[h]ere is what we [Innvision] have sent [to the Odessa Project customer] to date and all the mood boards from design. Let me know if you have any questions." Parr's email attached several documents and—most importantly—a spreadsheet. The spreadsheet listed stock codes, descriptions, order quantities, unit costs, unit prices, and net values. Parker testified that this spreadsheet was an "Innvision internal quotation," derived from Innvision's accounting software ("Markup Spreadsheet"). The other attached documents included mood boards, which Parker testified "are digitally constructed layouts of what an interior will look like when the fabrics and materials are combined together." The mood boards

depicted various FF&E arranged in virtual room configurations. The remaining attached documents included sales quotations, which show descriptions, unit prices, quantities, and total costs for various FF&E. The trial court found that "[Snowhite] knew these data were trade secrets and surreptitiously acquired them."

Snowhite first argues that even if Exhibit 22 were a trade secret, Innvision forfeited that trade secret status. Snowhite relies on *INEOS Group Ltd. v. Chevron Phillips Chemical Co., LP*, which held ". . . "the unrestricted disclosure of trade-secret information to third parties, outside the context of a confidential relationship, destroys the trade-secret status of the information." 312 S.W.3d 843, 852 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (internal citations omitted). Snowhite contends that—because Innvision submitted its trade secret to the Odessa Project customer—Innvision no longer enjoys trade-secret protection. Snowhite bases this assertion on the body of the email of Exhibit 22, framing the referenced disclosure to the Odessa Project customer as an "unrestricted disclosure." The body of the email reads "[h]ere is what we [Innvision] have sent [to the Odessa Project customer] to date and all the mood boards from design. Let me know if you have any questions."

Here, although Innvision concedes to piecemeal disclosure of certain parts of Exhibit 22 to the Odessa Project customer as a part of its bid proposal, there is conflicting evidence regarding whether the Markup Spreadsheet was disclosed to the Odessa Project customer. Apart from the sentence in Exhibit 22, there is scant support in the record that the Markup Spreadsheet was given to the Odessa Project

–11–

customer. Parker testified that Innvision "reviewed the files and emails that Pride Parr sent as part of the discovery process for this case, and [the Markup Spreadsheet] was not there." Parker further testified that Innvision expected the client to treat disclosed materials as confidential, so that no trade secret protection was lost:

> . . . [W]hen we send a client a sales quotation, we believe that information is confidential. Most clients in our experience do not share sales quotations from the competitor. And in that experience, that keeps it confidential in our eyes. I know there are instances where a client may choose to share that, but what we've seen is that most of the time a client is not sharing a competitor's quotation, therefore, we think it's confidential.

"[A] limited disclosure to others pledged to secrecy will not destroy the trade secret's status as such." *Leonard v. State*, 767 S.W.2d 171, 175 (Tex. App.—Dallas 1988); s*ee also Schalk v. State*, 823 S.W.2d 633 (Tex. Crim. App. 1991) (citing *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir.1986)). "If a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991). "Trade secret status is not destroyed simply by showing the protected item to prospective buyers, customers, or licensees." *Lamont v. Vaquillas Energy Lopeno, Ltd., LLP*, 421 S.W.3d 198, 212 (Tex. App.—San Antonio 2013, no pet.). The Fifth Circuit Court of Appeals has held:

> a holder may divulge his information to a limited extent without destroying its status as a trade secret. To hold otherwise would greatly limit the holder's ability to profit from his secret. If disclosure to others is made to further the holder's economic interests, it should, in appropriate circumstances, be considered a limited disclosure that does not destroy the requisite secrecy.

*Metallurgical Indus. Inc.*, 790 F.2d at 1200. In *Metallurgical Industries Inc.*, the Fifth Circuit held that trade secret holder Metallurgical's disclosures of its trade secret to others were limited—and therefore insufficient to extinguish the secrecy Metallurgical's other evidence had suggested—for two reasons. *Id*. First, Metallurgical's "disclosures were not public announcements; rather, Metallurgical divulged its information to only two businesses with whom it was dealing." *Id.* (distinguishing *Luccous v. J.C. Kinley Co.*, 376 S.W.2d 336 (Tex. 1964), "in which the court concluded that the design of a device could not be a trade secret because it had been patented—and thus revealed to all the world—before any dealing between the parties"). Second, Metallurgical "revealed its discoveries as part of business transactions by which it expected to profit." *Id*.

Similar to *Metallurgical*'s, the record shows that Innvision's disclosure of its bid proposal was not unrestricted. Innvision (i) divulged its bid proposal to the Odessa Project customer—not as a public announcement and (ii) divulged its bid proposal as a part of a business transaction by which it expected to profit. *See generally id*. Furthermore, there is evidence suggesting that Innvision did not submit the Markup Spreadsheet to the Odessa Project customer. Considering the evidence

–13–

in the light most favorable to the verdict and indulging every reasonable inference that would support the trial court's verdict, we conclude that a rational factfinder could have found the evidence was legally sufficient to support a finding that Innvision's disclosure(s) to the Odessa Project customer did not cause Innvision to forfeit its trade secret. Therefore, we conclude that legally sufficient evidence supports the trial court's implied finding that that Innvision's disclosure(s) to the Odessa Project customer did not cause Innvision to forfeit its trade secret. Considering all the evidence in the record supporting and contradicting the trial court's judgment, we also conclude that a rational factfinder could have found the evidence was factually sufficient that Innvision did not forfeit its trade secret. On this record, such a finding would not be so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. Therefore, we conclude that both legally and factually sufficient evidence supports the trial court's implied finding that Innvision did not forfeit its trade secret.

2)  Whether a Trade Secret Existed

Snowhite next argues that Innvision's Odessa Project bid proposal was not a trade secret even before disclosure to the Odessa Project customer. We have described above that Exhibit 22 consisted of information and compilation of data, so our focus turns to the remaining elements of a trade secret: (i) the economic value of the information and (ii) the efforts used to maintain the information's secrecy.

Parker testified that the Markup Spreadsheet's stock codes indicated the specific FF&E manufacturer for each particular item. He explained that the Markup Spreadsheet's relationship between the unit cost and unit price reveals the markup of Innvision's service to its customers—that "as a matter of practice, a salesperson would not send its company costs to a customer."[5] Parker explained that the Markup Spreadsheet, in combination with the design specifications and sales quotations in Exhibit 22, could be used by a competitor to "undercut" Innvision.

The record indicates that the general contractor for the Odessa Project provided Innvision with a list of FF&E items and quantities to be included in various areas. The record contains emails between the general contractor and Innvision in which certain vendors are named by reference in discussion of bids. The record indicates that the Wyndham FTP provided a "generic . . . prototype approved scheme pricing." However, those documents do not contain the respective vendors' pricing or markups with Innvision on the Odessa Project—the record shows that solely Exhibit 22 contains that combination of information.

Furthermore, the record shows that Innvision did not use the generic prototype on the Odessa Project. Parker testified that Innvision's "designers were designing a

---

[5] Parker testified "[u]nit cost here means the vendor pricing, the manufacturer's price to Innvision. That's a cost that we are going to pay that for that item, or a projected cost if this is a preliminary budget. So[,] unit cost and unit price have a relationship with each other. The markup that we talked about earlier, or the margin, is something that is relational between those two."

–15–

Baymont custom for that project." The record indicates that the vendor prices found in Exhibit 22 were unique to Innvision and derived from Innvision's relationship with its vendors. Parker explained that "vendor relationships were… one of the pillars of [Innvision's] success."

Both Aboona and Kapadia admitted that the information contained in Exhibit 22 was confidential. While working at Snowhite in October 2013, Aboona wrote in an email to a Wyndham representative about markups:

> I do recall this was asked of us when I was at Innvision and at that time I explained that this is confidential information as we could not generate one standard mark-up across the board since each FF&E category will differ in mark-up parameters in order to remain competitive. This explanation will also apply here as well and it will be difficult to provide you with our [Snowhite's] mark ups for the same reason.

During Kapadia's testimony in court, he was asked:

> Q: At least in the 2013 timeframe, did Snowhite consider margin information to be confidential?
>
> A: Yes.
>
> . . .
>
> Q: There's no dispute that at least in this industry margin information is confidential, right?
>
> A: Yes.

Furthermore, Kapadia testified that the Odessa Project used a custom scheme.

*ii. Efforts to Maintain Secrecy*

The record shows that Innvision took steps to maintain the secrecy of Exhibit 22. First, Innvision required Parr, Aboona, and its other employees to agree that they

would not disclose Innvision's confidential information for a period of two years after the term of their employment ended.[6] Second, Innvision used internal accounting software to maintain their vendor descriptions and pricing. With respect to this internal accounting software, Parker explained that Innvision (i) limited access to project salespeople or project support, (ii) protected access with password(s), (iii) ran the software on an internal Innvision network, and (iv) did not load the software onto outside salespeople's computers. As mentioned above, Innvision did not share its markups with its customers.

Thus, the record shows that the Exhibit 22 email consisted of information and compilation of data that (i) had independent economic value not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, which (ii) Innvision made reasonable efforts to maintain as a secret. Considering the evidence in the light most favorable to the verdict and

---

[6] Innvision's confidentiality agreement defines "confidential information" as follows:

7. <u>Confidential Information</u>. Employee agrees that he/she shall not, during the term of this Agreement and continuing for a period of two (2) years thereafter, disclose to any person or entity whatsoever, other than to Employer or its representatives, or use for his/her personal benefit or that of any party other than Employer in any manner whatsoever, any confidential or proprietary business information of Employer including, but not limited to, confidential and proprietary financial data, marketing data, product markets, market projections. sales leads und opportunities, contacts, customers or customer lists, vendor lists. product plans, products, prototypes or models, software, hardware, designs, drawings, research, engineering know-how, services, recipes, methods of manufacture or production, techniques for improved production which are not otherwise included within the definition of Trade Secrets all such information being collectively defined as ''Confidential Information.'' To the extent that Confidential Information covered by this paragraph constitutes a ''trade secret'' as that term is defined under applicable law, this paragraph is not intended to. and does not, limit or waive Employer's rights or remedies thereunder, and the time period for prohibition on disclosure or use of such trade secret information is as provided by such applicable law.

indulging every reasonable inference that would support the trial court's verdict, we conclude that a rational factfinder could have found that Innvision owned a trade secret in its bid proposal. Therefore, we conclude the evidence is legally sufficient that Innvision owned a trade secret in its bid proposal. Considering all the evidence in the record supporting and contradicting the trial court's finding, we conclude the trial court's finding that Innvision owned a trade secret was not so contrary to the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. We conclude that factually sufficient evidence supports the trial court's finding that Innvision owned a trade secret in its bid proposal. Since we conclude the evidence was legally and factually sufficient to show that (i) Innvision owned a trade secret and (ii) Innvision did not forfeit its trade secret, it was not error for the trial court to find liability under TUTSA. We overrule Snowhite's first issue.

## V. ISSUE TWO – WHETHER IT WAS ERROR TO FIND TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS WHERE THE ALLEGED INTERFERENCE WAS APPELLANT SUBMITTING AN IDENTICAL "PRELIMINARY BID" TO A MUTUAL CUSTOMER WHO HAD OPENLY SOLICITED COMPETING BIDS, HAD NOT YET SELECTED A VENDOR, AND ALL OF THIS IN A BIDDING ENVIRONMENT WHERE MUCH OR ALL OF SUCH "PRELIMINARY BID" IS DICTATED BY THE CUSTOMER

"Texas, like most states, has long recognized a tort cause of action for interference with a prospective contractual or business relation." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 712–13 (Tex. 2001).

> To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a

conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Snowhite argues that the trial court erred in making its finding that "Snowhite did tortuously interfere with [Innvision]'s prospective contract on the [Odessa Project]." Snowhite challenges the first, third, and fourth elements of tortious interference with prospective business relations in this issue.[7] Snowhite challenges the actual damage or loss element of tortious interference in its third issue discussed hereunder.[8]

1) Whether Snowhite's Conduct Was Independently Tortious or Unlawful

The trial court found, and we have confirmed, that Snowhite violated the TUTSA by misappropriating Innvision's trade secret. Trade secret misappropriation under the TUTSA is an "independently tortious act," which supports the third element of tortious interference with prospective business. *See id*; *Rugen*, 864 S.W.2d at 552; CIV. PRAC. & REM. §§ 134A.002(1), (3), (6). Snowhite urges that Innvision owned no trade secret, and therefore, no independently tortious act of trade

---

[7] Snowhite specifically argues (i) that the Odessa bid proposal was not a trade secret, so its acquisition and use by Snowhite cannot be construed as an independently tortious act; (ii) the evidence at trial was insufficient to establish that Innvision was likely to enter a business relationship with the Odessa Project customer; and (iii) "each entities' submission of identical 'preliminary bids' as the beginning stage to their separate and independent processes of designing unique final bids, does not demonstrate that Appellee was somehow robbed of its fair opportunity to win the Odessa business."

[8] We do not address the second element of tortious interference with prospective business relations— whether the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct—because Snowhite does not challenge the second element. *See Coinmach Corp.*, 417 S.W.3d at 923.

secret misappropriation occurred. We have rejected that argument, and Snowhite's briefing does not otherwise dispute the remaining elements of the independently tortious act of misappropriation of trade secret; therefore, we do not address those elements. Consequently, we reject Snowhite's assertion that its actions cannot be construed as an independently tortious act of trade secret misappropriation, which meets the third element of tortious interference with prospective business.

> 2) Whether There Was a Reasonable Probability that the Innvision Would Have Entered Into a Business Relationship with the Odessa Project Customer

Snowhite contends that there was no likelihood that Innvision would have entered into a business relationship with the Odessa Project customer but for Snowhite's actions. First, Snowhite frames Innvision's Odessa bid as "only in its infancy" and "merely . . . a preliminary bid." Snowhite refers to Parker's testimony that Innvision's "whole sales cycle from meeting a potential client to fulfilling their FF&E can take up to [twenty-four] months, but it's more common for it to take nine, [twelve] months if it's a new construction." Parker also testified that the Innvision quote was a "preliminary quote" and "that there are preliminarily estimates, and then there are final sales quotations." Nevertheless, the record shows that Snowhite's ultimate winning bid on the Odessa Project used documents and figures identical to those found in Innvision's "preliminary quote"—with slight changes such as changing the logo from "Innvision" to "Snowhite" and changing Innvision's employees' names to Snowhite's respective employee's names.

Snowhite next refers to evidence of email correspondence between Innvision and an Odessa Project customer's team member, Chad Huffer, to supports its argument that the Odessa Project customer had not committed to Innvision and was actively soliciting bidders ("Huffer Email"). However, the text of the Huffer Email does not discuss committing to Innvision or any other bidder. Regarding bids, the Huffer Email—which was emailed to Parr at her Innvision email address—states "[i]t has been difficult to get accurate bids based on the drawings because so many things are different from what I understand."[9]

Parker testified on the Odessa Project that "[i]n September [Innvision was] far enough along with that [Odessa Project customer] to know that we were engaged in the process. [Innvision's] credit team had been engaged and had received a credit application and letters from the [Odessa Project customer]'s bank." Parker further stated that—by the time a client talks with the Innvision credit team—

> 95 percent of the time we would expect to win a job, if the client has received preliminarily pricing, given us the credit application readily, provided all the information on the credit app so that we could do the research to determine where the funding is for the project and what sort of creditworthiness the client will have.
> . . .
> And further, to have the client introduce us to the banker and begin getting letters from the bank sent to us to build the case for the client that he or she has a creditworthy status. Once we've gotten to that point, even if the pricing hasn't been completely finalized, our credit team has

---

[9] Snowhite suggests that the Odessa Project customer accepted Snowhite's bid based on the Odessa Project customer's relationship with Parr. However—beyond Huffer's email's addressing Parr by her name— Snowhite offers no record citation to support this inference. Snowhite raises this suggestion in its assertions regarding proximate cause, discussed *infra*.

done that enough to see that the client is really our client. It's really something that we would 19 times out of 20 expect to win that business.[10]

We reject Snowhite's assertion that Innvision's Odessa bid was only in its infancy and merely a preliminary bid.

### 3) Whether Snowhite's Actions Proximately Caused Innvision Injury

The trial court found that Snowhite used Innvision's data "to obtain the 'Odessa Job,' which otherwise would have gone to [Innvision]." Snowhite contends that its actions did not proximately cause Innvision injury because the Odessa Project customer's "real allegiance was always to Pride Parr, not to [Innvision]." Apart from the Huffer Email discussed above, Snowhite cites no evidence to support this assertion—instead raising a purported opinion that "[i]t doesn't even make sense that submission of an identical bid would represent some sort of unfair advantage."

The evidence shows that Snowhite hired and used Parr, Gathright, and other former Innvision employees to obtain Innvision documents, including Innvision's custom scheme created for the Odessa Project and related trade secret documents. There is no evidence that Snowhite generated its own bid without use of the confidential Innvision documents. To the contrary, Snowhite used Innvision's trade secrets to submit a bid identical to Innvision's bid for the Odessa Project. Snowhite secured the Odessa Project and earned a profit, whereas Innvision did not earn profit

---

[10] Parker testified "the whole sales cycle from meeting a potential client to fulfilling their FF&E can take up to 24 months, but it's more common for it to take nine, 12 months if it's a new construction."

from its work. The evidence suggests that, were it not for Snowhite's actions in obtaining and using Innvision's confidential documents, the Odessa Project customer would have selected Innvision for the Odessa Project. We reject Snowhite's contention that its actions did not proximately cause Innvision injury.

Considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support the trial court's verdict, we conclude that a rational factfinder could have found that (i) there was a reasonable probability that Innvision would have entered into a business relationship with the Odessa Project customer; (ii) Snowhite's conduct was independently tortious or unlawful; and (iii) Snowhite's interference proximately caused Innvision injury. In our review of all the evidence in the record supporting and contradicting the trial court's judgment, we further conclude that the trial court's implied findings as to these three elements are not so contrary to the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. We conclude that legally and factually sufficient evidence supports the trial court's finding. Accordingly, it was not error for the trial court to find that Snowhite tortiously interfered with Plaintiff's prospective contract on the Odessa Project. We overrule Snowhite's second issue.

**VI. ISSUE THREE – WHETHER IT WAS ERROR TO FIND DAMAGES AND/OR TO CONSIDER EVIDENCE OF LOST PROFITS AT TRIAL WHERE NO LOST PROFITS DAMAGES CALCULATION WAS DISCLOSED AND THE ACTUAL EVIDENCE PRESENTED AT TRIAL WAS SPECULATIVE AND CONCLUSORY**

The trial court found that Innvision sustained damages for both violation of the TUTSA and tortious interference, measured at the same amount.[11] The Texas Supreme Court has held that "[a] 'flexible and imaginative' approach is applied to the calculation of damages in misappropriation-of-trade-secrets cases." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 710 (Tex. 2016) (quoting *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)).

> Damages in misappropriation cases can therefore take several forms, including the value of the *plaintiff's lost profits*, *the defendant's actual profits from the use of the secret . . .*
> . . .
> Loss of value to the plaintiff is usually measured by lost profits.
> . . .
> To recover lost profits, a party must introduce objective facts, figures, or data from which the amount of lost profits can be ascertained.

*Id.* at 710-711. (emphasis added, internal quotations and citation omitted). "The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010). Here, Snowhite argues that it was error for the trial court to consider evidence of

---

[11] The trial court found "[T]he measure of economic damages on the tortious interference claim is the same as for the TUTSA claim."

damages—in particular, testimony from Kapadia—because Innvision failed to disclose its proposed method of calculating damages prior to trial.

1) Challenged Testimony

During trial, Innvision introduced Kapadia's testimony from his June 14, 2017 deposition. Kapadia—testifying as Snowhite's corporate representative—testified as follows:

> Q: Four is a question about Pride Parr or is a topic list about Pride Parr.
> It says, six months of sales rep, did bring one—what
> does that say?
>
>> A: One project.
>
> Q: One project. Had trouble working with client and project, and that
> project was Baymont Odessa?
>
>> A: Baymont Odessa, yes.
>
> Q: And you mentioned before where there was an interrogatory
> response which says there was 600,000—
>
>> A: Yes.
>
> Q: —approximately in revenue generated from that deal?
>
>> A: Yes. And probably total that was a net sales part of it. And I
>> think we already submitted document, the net profit from that or
>> something like 45,000.
>
> . . .
> Q: But so out of that 600,000, the profit was 45,000?
>
>> A: 45,000.
>
> Q: The rest of that is eaten up in costs, huh?
>
>> A: The rest of them—yeah, cost.

Q: What is—

A: Overhead, cost and everything else.

Q: What is usually the profit margin that you're—

A: 15 percent usually.

Q: 15 percent. And my math isn't that great and that's why I became a lawyer. What is the margin—what is 45,000 on 600,000 in revenue?

A: That after reducing—oh, the 15,000, that's 90,000. That's a net profit less overhead expenses.

2) Analysis

Snowhite first contends that the trial court abused its discretion in admitting Kapadia's testimony on Snowhite's profits over Snowhite's motion to exclude evidence and according objection(s). Snowhite specifically complains that Innvision did not disclose or supplement its discovery responses with any amount or method of calculating economic damages.[12] Relying on *Heat Shrink Innovations, LLC v. Medical Extrusion Techs.—Tex., Inc.*, Snowhite asserts that Innvision's failure to timely disclose on the issue of damages resulted in unfair surprise or prejudice. No. 02-12-00512-CV, 2014 WL 5307191, at *6 (Tex. App.—Fort Worth Oct. 16, 2014, pet. denied) (mem. op.); *see* TEX. R. CIV. P. 193.6(a).[13] Snowhite further contends

---

[12] Snowhite's briefing does not direct us to any specific request for discovery. Rather, Snowhite refers to Texas Rule of Civil Procedure 194.2(d), which specifies that "A party may request disclosure of . . . the amount and any method of calculating economic damages." TEX. R. CIV. P. 194.2(d) We therefore presume that Snowhite complains Innvision failed to adequately respond to an according request for disclosure.

[13] Texas Rule of Civil Procedure 193.6(a) governs exclusion of evidence and exceptions as follows:

that the evidence supporting Innvision's lost profits was neither legally nor factually sufficient.

Innvision responds that it timely disclosed its damages, arguing that its Second Amended Petition filed on May 15, 2015, indicated that Innvision would be seeking its "lost profits" or Snowhite's "unjust enrichment" as damages. Innvision further claims that—during the trial court's October 22, 2018 hearing on Snowhite's Motion To Exclude All Evidence of Damages—it stated its intention to rely on the "testimony given by Snowhite in this case, a corporate representative," as a part of its damage theory.

*Heat Shrink* involved adjudication of, among other causes of action, misappropriation of trade secrets. *Id*. at *1. Pertinent to our discussion, the *Heat Shrink* appellants challenged evidence of lost profits, arguing that appellee failed to timely disclose its damages calculation. *Id.* at *4 (citing TEX. R. CIV. P. 194.2(d)). The appellee responded that it disclosed that "its damages model will include amounts for lost profits" in a fourth supplemental response to request for disclosures. *Id*. at *4-5. As in the instant case, the trial court permitted evidence on damages;

---

(a) Exclusion of Evidence and Exceptions. A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6(a).

however, the record in *Heat Shrink* showed that Bauer, appellee's operator, "had not made any calculation of lost profits. When asked what damages Bauer sought against [appellants], Bauer said, 'It would be the diminished sales of [a customer].'" *Id.* at *5–6. Appellee further "pointed to two separate sections of Bauer's deposition and suggested Heat Shrink was responsible for putting the two answers together and concluding that they formed [appellee]'s damage model." *Id.* at *6. Our sister court held that appellee (i) failed to show why its failure to provide the calculation was not unfair surprise or prejudice to the appellants and (ii) failed to provide a "single complete calculation of lost profits." *Id.* Our sister court concluded that "any evidence of lost profits admitted was in error [and] the award of lost profits predicated on such evidence was likewise in error." *Id.*

Unlike the appellant in *Heat Shrink*, Snowhite appears to claim that *its own corporate representative's* testimony was unfairly surprising or prejudicial when used as evidence on issue of damages.

In *Oscar Luis Lopez v. La Madeleine of Tex., Inc.*, we held:

> We consider this focus on surprise as to the "issues" in a case inaccurate. Although it might be possible that untimely supplemented or amended discovery responses could cause surprise concerning the issues in a case, rule 193.6(a) relates to the discovery of *evidence; its principal purpose—and most common application—is to protect a party from surprise concerning the existence of undisclosed evidence— not issues. The rule applies when the existence of evidence was not disclosed in a timely manner, whether or not such evidence related to an issue both parties knew existed in the case.* Thus, a party who failed to disclose the existence of an eye-witness to an auto accident cannot argue the absence of surprise or prejudice on the grounds that his party

> opponent was aware that whether the traffic light was red or green was an issue in the case.

200 S.W.3d 854, 862 (Tex. App.—Dallas 2006, no pet.) (emphasis added).

Here, Innvision's May 2015 pleading gave notice to Snowhite that it sought damages, which included lost profits. Kapadia—testifying as Snowhite's corporate representative during his deposition—testified to $45,000.00 in actual profit from the Odessa Project over a year before trial. The record shows that Snowhite secured the Odessa Project after submitting a bid identical to Innvision's Odessa bid. Since misappropriation damages can take the form of the defendant's actual profits from the use of the secret, Kapadia testified to a single complete calculation of lost profits when he testified that Snowhite earned $45,000.00 from the Odessa Project. *See Sw. Energy Prod. Co.*, 491 S.W.3d at 710–11; *ERI Consulting Eng'rs, Inc.*, 318 S.W.3d at 878.[14]

Unlike our hypothetical example of an eye-witness to an auto accident in *Oscar Luis Lopez*, the record here shows that Kapadia's testimony did not unfairly surprise or prejudice Snowhite; the challenged testimony arises directly from Snowhite's corporate representative. *See Oscar Luis Lopez*, 200 S.W.3d at 862. We have found no support for the position that a corporate representative's uncontroverted testimony about his or her business entity's profits unfairly

---

[14] Snowhite frames Kapadia's testimony regarding the $45,000.00 in profit as "speculative," complaining that Innvision should have submitted "objective evidence" in the form of Snowhite's profit documents. However, the record shows no objections to speculation as to this testimony, and there is no evidence controverting the testimony of Snowhite's earning $45,000.00 in profit.

prejudiced the business entity. Thus, the trial court did not abuse its discretion in admitting Kapadia's testimony.

In viewing the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it, and disregarding contrary evidence unless a reasonable factfinder could not, the record contains more than a scintilla of evidence to support the trial court's finding that Innvision sustained lost profits and economic damages. The trial court's findings on damages are not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. The evidence is legally and factually sufficient to support the trial court's findings on Innvision's damages. Accordingly, it was not error for the trial court to find damages of or to consider evidence of lost profits at trial. We overrule Snowhite's third issue.

## VII. ISSUE FOUR – WHETHER IT WAS ERROR TO AWARD ATTORNEY'S FEES UNDER TUTSA WHERE THE APPELLEE FAILED TO PROPERLY SEGREGATE ITS FEES, AND THERE IS NO SHOWING OF "MALICE" TO SUPPORT THE "WILLFUL & MALICIOUS MISAPPROPRIATION" ELEMENT OF SUCH AWARD

"A party who prevails in a lawsuit is entitled to recover attorney's fees only if permitted by statute or by contract." *Med. City Dall., Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58 (Tex. 2008) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006)). Under TUTSA, the court may award reasonable attorney's fees to the prevailing party if, among other bases, willful and malicious misappropriation exists. CIV. PRAC. & REM. § 134A.005(3). "Willful and malicious"

misappropriation is defined as "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret." CIV. PRAC. & REM. § 134A.002(7).[15] A trial court's decision about the reasonableness of an attorney's fee award is reviewed under an abuse of discretion standard. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). The reasonableness of attorney's fees is a fact question, and the appellate court may not substitute its judgment for the factfinder's. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009).

1) Whether Snowhite's Actions Were Willful and Malicious

The trial court found that Snowhite's "misappropriation was willful and malicious as [] defined in the TUTSA." Snowhite contends that Innvision presented no evidence regarding Snowhite's subjective intent in obtaining Innvision's Odessa Project information. Snowhite further contends that there is no evidence that it acted with ill will or "malice" toward Innvision.

The record shows (i) Snowhite—specifically Aboona—encouraged former Innvision employees to breach their confidentiality agreements with Innvision; (ii) Snowhite encouraged these former Innvision employees to participate in covert, comprehensive copying of Innvision documents, including at least one Innvision computer; (iii) Snowhite copied and accepted Innvision documents from current and

---

[15] Snowhite cites multiple cases from other states that interpret the Uniform Trade Secrets Act with respect to the terms willful and malicious. Although those cases may hold persuasive value, we note that in civil matters, "this Court is bound by decisions of the United States Supreme Court, the Texas Supreme Court, and prior decisions of this Court." *Owen v. Jim Allee Imports, Inc.*, 380 S.W.3d 276, 284 (Tex. App.—Dallas 2012, no pet.).

former Innvision employees; (iv) Snowhite reviewed the collected documents, with Kapadia corresponding with Aboona that information from the Innvision documents was "very helpful"; and (v) Snowhite used Innvision's trade secrets by submitting an identical bid for the Odessa Project. Furthermore, there is evidence that Snowhite recognized internally that its actions were in conscious disregard of Innvision's rights in its documents and corresponding trade secrets. In addition to Aboona's acknowledgement in correspondence of Gathright's "fear" in copying Snowhite documents, the record contains evidence that Kevin Barbarise stated in emails to Aboona and another Snowhite employee that he sought to "steal business from Innvision." The record also includes correspondence from Kapadia in which he states that he hopes to obtain more information from the copied Innvision documents—for other projects beyond the Odessa Project.

The record reveals that Snowhite's misappropriation of Innvision's trade secret was intentional and resulted from the conscious disregard of Innvision's rights. Viewing the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it, and disregarding contrary evidence unless a reasonable factfinder could not, the record contains more than a scintilla of evidence to support the trial court's finding that Snowhite's misappropriation of Innvision's trade secret was willful and malicious. We conclude the evidence was

legally sufficient to support the trial court's finding that Snowhite's "misappropriation was willful and malicious" against Innvision.[16]

### 2) Whether Attorney's Fees Awarded Were Properly Segregated and Reasonable

Snowhite next contends that Innvision failed to segregate its attorney's fees and that the amount of attorney's fees awarded were unreasonable. The trial court determined that Innvision was entitled to $133,891.60 as reasonable and necessary attorney's fees incurred through trial "attributable to the work performed by Plaintiff's Counsel on either tasks related to the TUTSA claim, or tasks that were inextricably intertwined with the TUTSA claims, and which, therefore, cannot be segregated therefrom."

Snowhite relies on our holding in *Regions Bank v. Bay* to argue that Innvision failed to segregate its attorney's fees. No. 05-12-00531-CV, 2013 WL 5299174, at *3 (Tex. App.—Dallas Sept. 18, 2013, no pet.) (mem. op.). In *Regions Bank* we held

> Where, as here, a party seeks attorney's fees in a case where some claims permit the recovery of fees and others do not, the party must segregate and exclude the fees for services related to the claims for which fees are not recoverable unless "the discrete legal services advance[d] both [the] recoverable claim and the unrecoverable claim."

---

[16] Snowhite frames this issue as a no evidence point. Considering all the evidence in the record supporting and contradicting the trial court's judgment, we conclude that a rational factfinder could have found that Snowhite's "misappropriation was willful and malicious" against Innvision. On this record, the trial court's finding is not so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. Out of an abundance of caution, we conclude that factually sufficient evidence supports the finding that Snowhite's misappropriation was willful and malicious, as well.

*Id.* (internal citations omitted). Snowhite argues that Innvision's counsel "made no serious attempt to segregate his legal fees." We have held that a party may segregate attorney's fees by percentage instead of by an entry-by-entry account. *See Kelly v. Isaac*, No. 05-19-00813-CV, 2020 WL 4746589, at *8-9 (Tex. App.—Dallas Aug. 17, 2020, pet. filed) (mem. op.). "[I]t is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable. *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 453 (Tex. App.—Dallas 2011, no pet.) (citing *Chapa*, 212 S.W.3d at 314).

Here, the record shows that Innvision submitted its attorney's fees by declaration of William E. Hammel with attached fee statements.[17] Hammel's declaration described the total amount of attorney's fees; provided the billing rates for himself, associates, and staff; declared that he reviewed the billing; and described the manner in which he segregated the attorney's fees that were recoverable under TUTSA as follows:

> Of the total amount of fees incurred in the amount of $156,343, it is my opinion that eighty-five percent (85%) of that amount was incurred pursuing the claims against Snowhite for which attorney's fees are recoverable. This is so because much of the legal work performed on behalf of Innvision necessarily overlapped and intertwined.

---

[17] The parties agreed at trial to submit their respective attorney fee applications by affidavit.

Thus, in accordance with *RM Crowe Property* and *Kelly*, Innvision segregated its attorney's fees by percentage. *See id.*; *Kelly*, 2020 WL 4746589, at *8–9.

"Sufficient evidence to support an award of attorney's fees includes, at a minimum, the following evidence: (1) the particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing the services." *KBIDC Investments, LLC v. Zuru Toys Inc.*, No. 05-19-00159-CV, 2020 WL 5988014, at *21 (Tex. App.—Dallas Oct. 9, 2020, no pet. h.) (citing *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 502 (Tex. 2019)). The fee statements attached to Hammel's declaration comply with each of these five requirements and otherwise detail the work performed. *See id*.

Although Snowhite claims Innvision's 85% segregation of attorney's fees is insufficient, Snowhite refers to no authority or controverting evidence in the record.[18] *See Rohrmoos Venture*, 578 S.W.3d at 501 ("if a fee opponent seeks a reduction, it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure"). "Testimony from a party's attorney about a party's attorneys' fees is taken as true as a matter of law if the testimony 'is not contradicted by any other witness and is clear, positive, direct, and

---

[18] We note that Snowhite questioned Innvision's attorney's fees entries in a post-trial motion and its appellate briefing. Nevertheless, the record does not show that Snowhite controverted those fees with evidence.

free from contradiction.'" *In re A.B.P.*, 291 S.W.3d 91, 98 (Tex. App.—Dallas 2009, no pet.) (quoting *Blockbuster, Inc. v. C-Span Entm't, Inc.*, 276 S.W.3d 482, 490 (Tex. App.—Dallas 2008, pet. granted)). Here, the record of Innvision's attorney's fees is clear, positive, direct, and free from contradiction. *See id.* We conclude that Innvision adequately segregated its recoverable attorney's fees.

In viewing the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it, and disregarding contrary evidence unless a reasonable factfinder could not, the record contains more than a scintilla of evidence to support the trial court's findings on Innvision's attorney's fees. Furthermore, after weighing all the evidence in the record, we can not conclude that the trial court's judgment on Innvision's attorney's fees is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Coupled with our conclusion that legally sufficient evidence supports the trial court's finding that Snowhite's misappropriation was willful and malicious, we conclude that the evidentiary record is both legally and factually sufficient to support the trial court's award of attorney's fees to Innvision under TUTSA. *See* Civ. Prac. & Rem. § 134A.005(3). We further conclude the trial court's determination and award of Innvision's attorney's fees in the amount of $133,891.60 was neither arbitrary nor unreasonable as this amount is approximately 85% of Innvision's total attorney's fees. The trial court did not abuse its discretion in awarding Innvision's attorney's

fees, and it was not error for the trial court to award Innvision's attorney's fees under TUTSA. We overrule Snowhite's fourth issue.

## VIII. CONCLUSION

Because we overrule all four of Snowhite's issues against it, we affirm the judgment of the trial court.

/Bill Pedersen, III//

181447f.p05

BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SNOWHITE TEXTILE AND
FURNISHINGS, INC., Appellant

No. 05-18-01447-CV      V.

INNVISION HOSPITALITY, INC.,
Appellee

On Appeal from the 193rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-14-11252.
Opinion delivered by Justice
Pedersen, III. Justices Osborne and
Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee INNVISION HOSPITALITY, INC. recover its costs of this appeal from appellant SNOWHITE TEXTILE AND FURNISHINGS, INC.

Judgment entered this 14th day of December, 2020.